UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN F. HANSON, JR. and JOHN F. HANSON, DMD, P.C., | § § § § | FILED CLERK'S OFFICE '04 FEB 24 A II: 20 U.S. DISTRICT COURT DISTRICT OF MASS. |
| Plaintiffs, | § | |
| v. | § § | Cause Number: _____ |
| ORTHALLIANCE INC., a Delaware corporation, | § § § | 04 - 30045 - KPN |
| Defendant. | § § | |

FILING FEE PAID:
RECEIPT # 30552,7
AMOUNT $ 150.00
BY DPTY CLK MGL
DATE 2/24/04

**PLAINTIFFS' ORIGINAL COMPLAINT**

Plaintiffs, John F. Hanson, Jr. and John F. Hanson, DMD, P.C. (collectively "Plaintiffs"),

hereby file this Original Complaint against OrthAlliance, Inc. ("OrthAlliance") as follows:

## INTRODUCTION

1.       This is a case to stop the illegal corporate practice of dentistry by OrthAlliance in

the Commonwealth of Massachusetts, as well as to stop OrthAlliance's practice of illegal fee

splitting. As set forth herein, OrthAlliance, through a pattern of misrepresentations and false

promises, induced Plaintiffs to enter into a series of management services contracts that: (a)

unfairly restrict the Plaintiffs from practicing dentistry in violation of Massachusetts law and

Massachusetts public policy; (b) require the payment of outrageous fees and expenses to

OrthAlliance by the Plaintiffs for illusory or nonexistent services in an attempt to disguise what

is, in substance, illegal fee splitting and kickbacks; and (c) constitute, in their totality, the illegal

corporate practice of dentistry.

2.       Significantly, OrthAlliance entered into a merger agreement with Orthodontic

Centers of America, Inc. ("OCA"), whose former Chairman has stated that the management

services contracts utilized by OrthAlliance can be voided "on the basis that it is fee splitting because [OrthAlliance] does not provide any structured services." OrthAlliance has similarly stated in an annual report on Form 10-K that "[t]here can be no assurance that the legality of any long-term management services agreements that have been entered into will not be successfully challenged." The Plaintiffs request the Court to declare what OrthAlliance and OCA already recognize: that the contracts and agreements forming the basis of this suit are void or voidable as against the public policy of the Commonwealth of Massachusetts.

3.      Alternatively, in the event these contracts are deemed to be valid and enforceable, Plaintiffs will demonstrate that: (1) OrthAlliance breached the contracts by failing to perform the services it was obligated to provide; and (2) procured the contracts through a series of fraudulent misrepresentations which were intended to, and had the effect of, inducing the Plaintiffs into entering into the contracts.

## JURISDICTION

4.      Plaintiffs bring this civil action under the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. The matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and each claim asserted herein is between citizens of different states.

## VENUE

5.      Venue of this civil action is proper in the District of Massachusetts under 28 U.S.C. § 1391(a)(2) as it is the judicial district where a substantial part of the events or omissions giving rise to the claims occurred.

## PARTIES

6.      Plaintiff John F. Hanson, Jr. ("Dr. Hanson") is a citizen of the Commonwealth of Massachusetts and an individual residing in Berkshire County, Massachusetts. Dr. Hanson is a

Doctor of Dental Medicine, licensed to pratice dentistry in the Commonwealth of Massachusetts pursuant to Massachusetts law. Dr. Hanson specializes in the practice of orthodontics.

7.     Plaintiff John F. Hanson, DMD, P.C. is a citizen of the Commonwealth of Massachusetts and a Massachusetts professional corporation, having its principal place of business in Berkshire County at Berkshire Dental Park, 435 South Street, Pittsfield, Massachusetts, 01201. John F. Hanson, DMD, P.C. is the legal successor in interest to Hanson Orthodontia Services, P.C., and has succeeded to all legal rights and duties thereof (collectively, "Hanson P.C.").[1]  Dr. Hanson is the sole shareholder of Hanson P.C.

8.     Defendant OrthAlliance is citizen of Delaware and a Delaware corporation, with its principal place of business at 23848 Hawthorne Boulevard, Suite 200, Torrance, California 90505. OrthAlliance is subject to personal jurisdiction in this state because it has entered into, or is a party to, one or more contracts with each of the Plaintiffs, and these contracts are to be performed in whole or in part within the state.

## FACTUAL BACKGROUND

9.     In or around 1998, OrthAlliance induced Plaintiffs to enter into a series of agreements. The transaction involved the following core documents:

(a)     a Plan of Reorganization between OrthAlliance, Dr. Hanson and Old P.C.;

(b)     a Service Agreement entered into between OrthAlliance and Hanson P.C.; and

---

[1]     Prior to execution of the Agreements with OrthAlliance, a separate professional corporation also known as John F. Hanson, DMD, P.C. ("Old P.C.") existed and was the entity through which Dr. Hanson provided orthodontic care. Old P.C. was merged into OrthAlliance and ceased its existence as a separate corporate entity. At or near the same time, Dr. Hanson created Hanson Orthodontia Services, P.C. ("Hanson Orthodontia") to contract with OrthAlliance. Because Old P.C. ceased to exist, Dr. Hanson changed the name of Hanson Orthodontia to John F. Hanson, DMD, P.C.

**PLAINTIFFS' ORIGINAL COMPLAINT – PAGE 3**

(c)    an Employment Agreement entered into between Dr. Hanson and Hanson P.C. (collectively the "Agreements").

10.    Under the Plan of Reorganization, OrthAlliance merged with Old P.C. and acquired substantially all of the physical assets of Old P.C. Following the merger, Old P.C. ceased to exist as a separate entity.

11.    Pursuant to the Service Agreement, OrthAlliance agreed to provide comprehensive practice management services to Hanson P.C. The Service Agreement expressly names OrthAlliance as Hanson P.C.'s "sole and exclusive business manager" and grants OrthAlliance "all power and authority reasonably necessary to manage the business affairs of [Hanson P.C.]."

12.    The intent of the Service Agreement, as established by the recitals contained therein, was, in part, to improve the efficiency and profitability of Hanson P.C.

13.    Pursuant to the Service Agreement, OrthAlliance is obligated to provide to Hanson P.C. "offices, facilities, furnishings, equipment and related services." OrthAlliance is also required to provide maintenance and upkeep to the foregoing on an "ongoing basis." In connection with providing such facilities and equipment, OrthAlliance is also required, on an ongoing basis, to evaluate and consult with Plaintiffs on the equipment needs of and the efficiency and adequacy of the facilities utilized by Hanson P.C.

14.    The Service Agreement also requires OrthAlliance to "employ" all of Hanson P.C.'s staff, except orthodontists, dental hygienists, and dental assistants,. In connection therewith, OrthAlliance is responsible for performing all payroll and payroll accounting functions for Hanson P.C.

15.     Although OrthAlliance purports to "employ" Hanson P.C.'s staff under the Service Agreement, OrthAlliance has not exercised any control or supervision over these employees. All personnel decisions relating to hiring, firing, salaries, bonuses, and hours have been left up to Dr. Hanson. There is no legally recognizable employer-employee relationship under the Service Agreement sufficient to create an agency relationship between OrthAlliance and Hanson P.C.'s employees.

16.     Additionally, in consultation with Hanson P.C., OrthAlliance is obligated to develop and implement business systems and procedures that are designed to improve Hanson P.C.'s operating efficiency. OrthAlliance is also required to train Hanson P.C.'s staff in the implementation and operation of such business systems and procedures, as well as to train the staff in the use of clinical forms, including, without limitation, forms for patient evaluation and treatment plans.

17.     The Service Agreement also obligates OrthAlliance, in consultation with Hanson P.C., to purchase and maintain all inventory and supplies required by Hanson P.C. OrthAlliance is also obligated to handle and process all purchasing and payment activities in connection with maintaining inventory and supplies.

18.     Additionally, OrthAlliance is required to train Hanson P.C.'s staff in the use of information systems to produce financial and operational information concerning Hanson P.C.'s operations. OrthAlliance is required to analyze this information on an ongoing basis and advise Hanson P.C. on ways of improving operating efficiencies. In connection therewith, OrthAlliance is obligated to arrange all accounting and bookkeeping services related to Hanson P.C.

19.     OrthAlliance is also required to arrange for all legal services reasonably required by Hanson P.C.

20.    OrthAlliance is also obligated to design and execute a marketing plan to promote Hanson's professional services.  In connection with such marketing efforts, OrthAlliance is obligated to advise Hanson P.C. in establishing a financing program on an installment basis.

21.    Moreover, the Service Agreement requires OrthAlliance to assess and advice Hanson P.C. on the establishment of orthodontic offices in new locations and, subject to mutual agreement, to provide assistance to Hanson, P.C. in the opening of such new offices, including assistance in the location of such offices and, where appropriate, in the sale of existing practices. This obligation includes the requirement to locate a replacement orthodontist in the event Dr. Hanson seeks to retire or ever becomes disabled.

22.    In addition, OrthAlliance is obligated to provide certain financial services to Hanson P.C. in connection with collecting accounts receivable and paying third-party vendors. Specifically, OrthAlliance is responsible for: (i) billing and collecting payments for all orthodontic services rendered by Hanson P.C.; (ii) receiving payments from patients, insurance companies and all other third party payors; (iii) taking possession of and endorsing in the name of Hanson P.C. any notes, checks, money orders, insurance payments and other instruments received in payment of accounts receivable; (iv) administering Hanson P.C.'s payroll; (v) preparing and submitting Hanson P.C.'s monthly operating data and quarterly financial reports; and (vi) paying Hanson P.C.'s "Center Expenses" as set forth in the Service Agreement.

23.    In connection with these financial services, Hanson P.C. was required to establish an "Orthodontic Entity Account," which OrthAlliance alone controls.  On a continuous basis, Hanson P.C.'s accounts receivables are swept into these accounts for OrthAlliance to manage and use in paying costs, fees, and expenses.

24.    Finally, OrthAlliance is required under the terms of the Service Agreement to supervise, manage, organize and develop systems with respect to all files and records relating to the operation of Hanson P.C., including but not limited to accounting, billing, patient records, and collection records.

25.    In exchange for providing these services, OrthAlliance receives a "service fee" in the amount of 17% of Hanson P.C.'s gross adjusted income. Although OrthAlliance has wholly failed to provide the services required by the terms of the Service Agreement, it has continuously withdrawn its service fee from Hanson P.C.'s accounts.

26.    Dovetailing with the Service Agreement is the Employment Agreement, which OrthAlliance required Dr. Hanson to execute with Hanson P.C. The Employment Agreement prohibits Dr. Hanson from practicing orthodontics except as an employee of Hanson P.C. Dr. Hanson is also prohibited from engaging in or participating in the practice of orthodontics within a ten (10)-mile radius of any location maintained by Hanson P.C. for a period of two (2) years following termination of the Employment Agreement. Similarly, Dr. Hanson is barred for a two year period from: (i) engaging in advertising or marketing within the 10 mile radius; (ii) soliciting or marketing their orthodontic services to any existing or former patients; and (iii) soliciting Hanson P.C.'s staff.

27.    The Employment Agreement contains only a five year term, whereas the Service Agreement contains a twenty-five year term. Either Dr. Hanson or Hanson P.C. could terminate the Employment Agreement by its own terms at the end of the initial five year period.

28.    OrthAlliance is not a party to the Employment Agreement. However, OrthAlliance purports to hold "third-party beneficiary" rights to the non-competition covenants contained therein even though OrthAlliance cannot, by law, practice dentistry.

29.     As set forth in detail below, the interrelationship between the Agreements violate Massachusetts law and public policy, and therefore, should be declared void and enforceable as a matter of law.

30.     In the alternative, OrthAlliance failed to provide the comprehensive practice management services called for under the terms of the Service Agreement and induced Plaintiffs to execute the Agreements through a series of fraudulent misrepresentations designed to induce Plaintiffs to execute the Agreements and to continue making service fee payments. Accordingly, Plaintiffs are entitled to substantial economic damages.

31.     All conditions precedent to the Plaintiffs bringing this action have occurred or have been excused.

## CLAIMS FOR RELIEF

### COUNT I.

### DECLARATION REGARDING THE INVALIDITY OF
### THE RESTRICTIVE COVENANTS

32.     Plaintiffs reincorporate by reference the allegations of Paragraph 1-31 as though fully set forth herein.

33.     Declaratory relief under the Federal Declaratory Judgment Act is appropriate in this action in that there is a real, actual, and substantial controversy between the Parties regarding the validity and enforceability of the restrictive covenants in the Service Agreement and the Employment Agreement. This controversy is ripe for adjudication as Plaintiffs seek to engage in acts in contravention of the restrictive covenants, which OrthAlliance likewise seeks to restrain. Declaratory relief would serve a useful purpose in declaring the Parties' rights under the restrictive covenants and would eliminate the legal uncertainty and insecurity regarding this controversy.

34.     OrthAlliance claims the right to enforce two restrictive covenants that prevent Dr. Hanson from competing with Hanson P.C. and Hanson P.C. from competing with OrthAlliance. Under these restrictive covenants, Dr. Hanson is prohibited from engaging in or participating in the practice of orthodontics within a ten (10) mile radius of any location maintained by OrthAlliance for a period of two (2) years following termination of the Employment Agreement. Similarly, Dr. Hanson is barred for a two year period from: (i) engaging in advertising or marketing within the ten (10) mile radius; (ii) soliciting or marketing his orthodontic services to any existing or former patients; and (iii) soliciting Hanson P.C.'s staff.

35.     Massachusetts law declares that every agreement in restraint of trade or commerce is invalid in the Commonwealth of Massachusetts. The restrictive covenants at issue herein are invalid because there is no competition between OrthAlliance and Plaintiffs. Specifically, neither Hanson P.C. nor Dr. Hanson is in the business of providing comprehensive practice management services, and OrthAlliance is prohibited by law from practicing dentistry. Because there is no competition between the parties, these covenants not to compete are nothing more than naked restraints of trade, and therefore, are void and unenforceable.

36.     Furthermore, the restrictive covenants are invalid on public policy grounds in that they unreasonably and unjustifiably intrude into the doctor-patient relationship, and therefore, are injurious to the public welfare. Specifically, enforcing the restrictive covenants would require patients to travel greater distances to visit their treating doctors. In many cases patient treatment will be delayed. The public in general, through the restrictions on advertising, referral, and solicitation will be deprived of information that would enable them to make informed choices regarding the best treatment for themselves and for their children. Additionally, and

very importantly, the enforcement of the restrictive covenants by OrthAlliance will put Dr. Hanson at risk of violating rules prohibiting a dentist from abandoning a patient.

37.     In addition, the restrictions in the covenants not to compete are unreasonably broad and contain a virtually limitless geographic range.  Specifically, the covenants not to compete prohibit Plaintiffs from advertising through any electronic media within a ten mile radius of Hanson P.C.  The covenant is not limited to sources *within* the 10 mile zone of protected activity, but rather includes any electronic media that may be broadcast *into* the zone of protected activity.  Thus, for example, Dr. Hanson would be prohibited from moving his practice to California and advertising his services on the internet because such "electronic media" could find its way into the zone of protected activity.  At the very least, the scope of the covenant is void for vagueness.

38.     Furthermore, the two-year limitation imposed by the covenants has already expired.  Thus, the covenants are no longer enforceable according to their own terms, and OrthAlliance is barred from seeking to enforce the terms contained therein.

39.     For the foregoing reasons, Plaintiffs seek a declaration that the restrictive covenants are void and/or voidable and that Plaintiffs are entitled to engage in acts in contravention of the terms of the restrictive covenants.  In the alternative, Plaintiffs seek a declaration that the covenants have expired, may not be enforced, and are no longer of any effect.  Furthermore, Plaintiffs are entitled to recover their attorneys' fees and court costs in bringing this declaratory judgment action.

## COUNT II.

## DECLARATION REGARDING THE INVALIDITY OF THE AGREEMENTS AS CONSTITUTING THE UNAUTHORIZED PRACTICE OF DENTISTRY

40.    Plaintiffs reincorporate by reference the allegations of Paragraph 1-39 as though fully set forth herein.

41.    Declaratory relief under the Federal Declaratory Judgment Act is appropriate in this action in that there is a real, actual, and substantial controversy between the Parties regarding the validity and enforceability of the Agreements on the grounds that they grant OrthAlliance the power, ability, and opportunity to engage in the unauthorized corporate practice of dentistry. This controversy is ripe for adjudication as OrthAlliance seeks continued enforcement of agreements that are contrary to Massachusetts law and public policy. Declaratory relief would serve a useful purpose in declaring the Parties' rights under the Agreements and would eliminate the legal uncertainty regarding this controversy.

42.    Through the web of interlocking provisions contained in the Agreements, OrthAlliance is able to dictate virtually every material aspect of Plaintiffs' dental practice. OrthAlliance can control the cash, it can control the payment of bills, it can influence or control the employment of professional personnel, including orthodontists, and it can control the very livelihood of the individuals who generate the income OrthAlliance enjoys—by barring those individuals from employment. This influence and control violates the prohibition against the corporate practice of dentistry under Massachusetts law. The Agreements between and among the Plaintiffs and OrthAlliance are therefore contrary to Massachusetts law and public policy.

43.    Furthermore, Massachusetts law prohibits corporations from practicing dentistry, either directly or through affiliation with another licensed dentist.    In this case, the interrelationship of the Agreements allows OrthAlliance to own, operate, and maintain Hanson

P.C. while at the same time maintain Dr. Hanson's services under a quasi-employment relationship. Accordingly, the Agreements are illegal because they permit the unauthorized corporate practice of dentistry.

44.    Significantly, the interrelationship between the parties under OrthAlliance's contracts, and the rights and responsibilities established thereunder, recently prompted the United States District Court for the Northern District of Texas, Dallas Division to declare nearly identical contracts to be void and illegal in their entirety under analogous Texas law.

45.    For the foregoing reasons, the Plaintiffs seek a declaration that the Agreements are void and/or voidable. Furthermore, Plaintiffs are entitled to recover their attorneys' fees and court costs in bringing this declaratory judgment action.

**COUNT III.**

**DECLARATION REGARDING THE INVALIDITY OF THE AGREEMENTS AS CONSTITUTING THE UNAUTHORIZED SPLITTING OF DENTAL FEES**

46.    Plaintiffs reincorporate by reference the allegations of Paragraph 1-45 as though fully set forth herein.

47.    Declaratory relief under the Federal Declaratory Judgment Acts is appropriate in this action in that there is a real, actual, and substantial controversy between the Parties regarding the validity and enforceability of the Agreements on the grounds that the Agreements constitute the unlawful splitting of dental fees in violation of Massachusetts law and public policy. This controversy is ripe for adjudication as OrthAlliance seeks continued enforcement of agreements that is contrary to Massachusetts law and public policy. Declaratory relief would serve a useful purpose in declaring the Parties' rights under the Agreements and would eliminate the legal uncertainty regarding this controversy.

48.     Massachusetts law prohibits the splitting of dental fees and unauthorized kickbacks. To avoid illusory transactions which tend to mask such unauthorized conduct, a practice management company such as OrthAlliance must charge a service fee that is reasonably related to the fair market value of the services provided. OrthAlliance, however, manipulates its service fee to operate as a return on investment for the consideration it paid Plaintiffs for affiliating with OrthAlliance in the first place. There is no reasonable correlation between the amount of service fees paid and the amount of services provided.

49.     The Agreements expressly grant OrthAlliance the authority to secure and/or solicit patients in an unlawful manner. Specifically, the interrelationship between OrthAlliance's obligation to design and implement a marketing strategy and the calculation of the service fees as a fixed percentage of the Practice Group's gross income constitutes unlawful fee-splitting because the amount of service fees collected under this arrangement is inherently tied to the volume and value of patient referrals produced by OrthAlliance. Moreover, the absence of any reasonable relationship between the services to be provided under the Service Agreement and the amount of the service fees to be paid, especially in light of the definition of "Center Expense" in the Service Agreement which permits OrthAlliance to recoup all costs and expenses in performing its obligations, establishes that the Agreements are nothing more than an instrumentality through which OrthAlliance seeks to split dental fees.

50.     In addition, OrthAlliance's service fee is not reasonably related to the fair market value of the services provided under the Service Agreement, but rather, represents a return on OrthAlliance's investment in purchasing the assets of Plaintiffs' former professional corporation.

51.    Specifically, under the Plan of Reorganization, OrthAlliance agreed to merge with Hanson's previous professional corporation and pay a premium for the assets of this practice, without regard for the actual value of the assets purchased.

52.    OrthAlliance then sought to recoup this initial investment by collecting as a "service fee" a fixed percentage of Plaintiffs' gross adjusted revenue. The amount of the service fee was not dependent upon the fair market value of the services provided, but rather would fluctuate depending upon how much Plaintiffs received under the Plan of Reorganization.

53.    For example, if Plaintiffs consented to a 17% service fee rather than a 14% service fee, OrthAlliance would agree to pay a higher premium for the assets it was purchasing under the Plan of Reorganization, even though the amount and value of the assets did not change.

54.    This scheme is illegal in the Commonwealth of Massachusetts. Although licensed orthodontists may contract with practice management companies, the service fees charged by such companies must be reasonably related to the fair market value of the services provided. The scheme hatched by OrthAlliance constitutes illegal fee splitting because it gives OrthAlliance an interest in Plaintiffs' gross revenues, earned through patient fees, simply on a cash basis and not as a bona fide fee for services exchange.

55.    For the foregoing reasons, the Plaintiffs seek a declaration that the Agreements are void and/or voidable. Furthermore, Plaintiffs are entitled to recover their attorneys' fees and court costs in bringing this declaratory judgment action.

## COUNT IV.

## FRAUD

56.    Plaintiffs reincorporate by reference the allegations of Paragraph 1-55 as though fully set forth herein.

57.    Plaintiffs were fraudulently induced into entering into and remaining in the Service Agreement by certain representations that were fraudulent when made, or were made recklessly and without knowledge of the truth of the matter asserted. These fraudulent misrepresentations include the following:

    a.  OrthAlliance induced Plaintiffs to execute the Service Agreement by representing that the services it would provide would be of a high quality, value, and usefulness.  These representations were fraudulent because the services actually provided were of poor quality, no value and virtually useless.  The services often duplicated or mimicked what Hanson P.C. was already independently providing for itself.  In many cases, the services were inferior.  Moreover, the advice provided by OrthAlliance was usually sophomoric, unhelpful, and readily accessible from other sources.  Often the services would not be performed in a timely manner, would be provided without adequate training or support, would be provided only after repeated requests, or would not be provided at all.  Plaintiffs would never have executed or remained in the Service Agreement if they knew that OrthAlliance would not provide services that were of high quality, value and usefulness.

    b.  OrthAlliance induced Plaintiffs to execute the Service Agreement by representing that it would find a certified and fully qualified orthodontist to take over the Plaintiffs' practice if necessary.  Specifically, OrthAlliance represented that when Dr. Hanson was ready to leave his practice, either because of retirement or disability, that he would be able to have a "second sale" of Hanson P.C.  OrthAlliance, however, does not have, and has never had, qualified orthodontists

willing and able to take over the affiliated practices, and now disclaims any obligation to locate a replacement orthodontist. Plaintiffs would never have executed or remained in the Service Agreement if they knew that OrthAlliance would not find a certified and fully qualified orthodontist to take over the Individual Plaintiff's practice when he was ready to leave.

c.  OrthAlliance induced Plaintiffs to execute the Service Agreement by representing that it would manage the administrative aspects of Dr. Hanson's practice so that he could focus on orthodontics and be relieved of administrative responsibilities and paperwork. These representations were fraudulent because the Service Agreement increased Plaintiffs' administrative burdens and paperwork by the requirement for continuous input from the Plaintiffs, which was frequently ignored, by the failure to manage the administrative aspects of Hanson P.C., and by the failure to hire, train, or lease any additional staff members or other administrators to manage Hanson P.C.  Plaintiffs would never have executed or remained in the Service Agreement if they knew that OrthAlliance would not manage the administrative aspects of the practice and relieve Plaintiffs of administrative responsibilities and paperwork.

d.  OrthAlliance induced Plaintiffs to execute the Service Agreement by representing that it would never merge with or associate with OCA. Plaintiffs expressly stated their desire not to associate with OCA because of the negative perception that OCA's business model stresses quantity of medical care over quality of medical care, without due regard for the best interests of the patient, which would negatively affect Dr. Hanson's quality of life and Hanson P.C.'s ability to recruit

new and qualified orthodontists. These representations were fraudulent because OrthAlliance's board of directors recently approved a merger with OCA, placing the Service Agreement under the direct managerial control of OCA. Plaintiffs would never have executed or remained in the Service Agreement if they knew that OrthAlliance intended to merge or otherwise associate with OCA.

58. The above misrepresentations were made by OrthAlliance principals and recruiting agents, including Paul Hayase, Randy Schmidt, Sam Westover, and Dennis Summer, as well being included in certain recruiting materials, prospectuses, SEC filings, and the Service Agreement.

59. These misrepresentations were made during or near the time of the negotiation of the Service Agreement and recruitment of Dr. Hanson and Hanson P.C. and were made in numerous telephone conferences and personal meetings between Plaintiffs and OrthAlliance.

60. These representations were material to Plaintiffs' decisions to enter into and remain in the Service Agreement.

61. These representations were false, and OrthAlliance knew them to be false, or made them recklessly without any knowledge of the truth of the matter asserted.

62. OrthAlliance made these representations with the intent that Plaintiffs rely on the representations.

63. Plaintiffs did reasonably and justifiably rely on these representations.

64. These misrepresentations have proximately caused substantial economic damages to the Plaintiffs in amounts within the jurisdictional limits of this court, for which the Plaintiffs now sue.

65.    Additionally, and in the alternative, these misrepresentations entitle the Plaintiffs to rescind the Service Agreement, at their option, and to be, among other things, fully reimbursed for any and all service fees and expenses paid thereunder.

## COUNT V.

## BREACH OF CONTRACT

66.    Plaintiffs reincorporate by reference the allegations of Paragraph 1-65 as though fully set forth herein.

67.    The Service Agreement required OrthAlliance, among other things, to:

    a.    provide comprehensive practice management;

    b.    perform all payroll and payroll account functions;

    c.    provide business systems designed to improve operating efficiency;

    d.    handle all purchasing and accounts payable for the Plaintiffs, and to pass on the benefits of rebates it obtains;

    e.    train the Plaintiffs' staff in the use of information systems and to prepare and provide all necessary financial and operational reports on a timely basis;

    f.    provide certain legal services;

    g.    design and execute a marketing plan for the Plaintiffs;

    h.    undertake all requisite billing and collection services for the Plaintiffs; and

    i.    perform the other services specified in the agreements.

68.    OrthAlliance has repeatedly breached the Service Agreement by failing to perform one or more of the services described above and to provide the services in accordance with and the manner proscribed by the Service Agreement.

69.    Hanson P.C. has properly provided notice of such breaches to OrthAlliance, but such breaches have not been cured.

70.    These breaches have caused substantial economic damages to the Plaintiffs in amounts within the jurisdictional limits of this court, for which Plaintiffs now sue.

71.    Plaintiffs also request a declaration that they have the legal right to terminate the Service Agreement as a result of OrthAlliance's prior material breaches.

## COUNT VI

### VIOLATION OF G. L., c. 93A

72.    Plaintiffs reincorporate by reference the allegations of Paragraph 1-71 as though fully set forth herein.

73.    OrthAlliance's conduct in dealing with Plaintiffs constitutes unfair and deceptive acts or practices in violation of General Laws, chapter 93A, among others, as follows:

   a.  By affirmatively misrepresenting that the services OrthAlliance would provide would be of a high quality, value, and usefulness. These representations were fraudulent because the services actually provided were of poor quality, no value and virtually useless. The services often duplicated or mimicked what Hanson P.C. was already independently providing for itself. In many cases, the services were inferior. Moreover, the advice provided by OrthAlliance was usually sophomoric, unhelpful, and readily accessible from other sources. Often the services would not be performed in a timely manner, would be provided without adequate training or support, would be provided only after repeated requests, or would not be provided at all.

   b.  By affirmatively misrepresenting that OrthAlliance would find a certified and fully qualified orthodontist to take over the Plaintiffs' practice if necessary. Specifically, OrthAlliance represented that when Dr. Hanson was ready to leave

his practice, either because of retirement or disability, that he would be able to have a "second sale" of Hanson P.C. OrthAlliance, however, does not have, and has never had, qualified orthodontists willing and able to take over the affiliated practices, and now disclaims any obligation to locate a replacement orthodontist.

c. By affirmatively misrepresenting that OrthAlliance would manage the administrative aspects of Dr. Hanson's practice so that he could focus on orthodontics and be relieved of administrative responsibilities and paperwork. These representations were fraudulent because the Service Agreement increased Plaintiffs' administrative burdens and paperwork by the requirement for continuous input from the Plaintiffs, which was frequently ignored, by the failure to manage the administrative aspects of Hanson P.C., and by the failure to hire, train, or lease any additional staff members or other administrators to manage Hanson P.C.

d. By affirmatively misrepresenting that OrthAlliance would never merge with or associate with OCA. Plaintiffs expressly stated their desire not to associate with OCA because of the negative perception that OCA's business model stresses quantity of medical care over quality of medical care, without due regard for the best interests of the patient, which would negatively affect Dr. Hanson's quality of life and Hanson P.C.'s ability to recruit new and qualified orthodontists. These representations were fraudulent because OrthAlliance's board of directors recently approved a merger with OCA, placing the Service Agreement under the direct managerial control of OCA.

e.  By failing to disclose that high-quality and valuable services would not be forthcoming in response to repeated inquiries by affiliated orthodontists, including Dr. Hanson, as to when services would be provided. Specifically, OrthAlliance sought to placate affiliated practices, including Hanson P.C., by representing that additional services would be forthcoming or "were in the pipeline," when in fact such services were not forthcoming because management was fixated with boosting the value of its stock price to the detriment of providing services to its clients. OrthAlliance failed to disclose such facts for the purpose of inducing affiliated practices, including Hanson P.C., to continue paying its services fees.

f.  By refusing to provide the services called for under the Service Agreement while simultaneously claiming that such services were being provided by the staff of Hanson P.C. Specifically, under the Service Agreement, OrthAlliance purports to employ the non-professional staff of Hanson P.C., even though Dr. Hanson is responsible for training, controlling, hiring, firing, and paying the staff. Based on this artificial relationship, OrthAlliance purports to take credit for all of the services performed by the staff of Hanson P.C., even though the staff of Hanson P.C. provided the same services prior to, during, and after affiliation with OrthAlliance. OrthAlliance used this artifice in a blatant attempt to excuse its non-performance and to unfairly dissuade Plaintiffs from exercising their legal rights. Furthermore, OrthAlliance's use of this artifice establishes that it never intended to actually provide services that were designed to improve Hanson P.C.'s efficiency and profitability, as OrthAlliance previously represented and agreed.

74.     As a result of these unfair and deceptive acts and/or practices Plaintiffs suffered damages within the jurisdictional limits of this Court, including the payment of service fees, center expenses, depreciation expenses, attorney's fees, interest, costs, and other damages for which Plaintiffs now sue.

75.     Upon information and belief, these unfair and deceptive acts and/or practices were undertaken willfully and knowingly by OrthAlliance, thereby entitling Plaintiffs to treble damages as provided by G. L., c. 93A, § 9(3)

## COUNT VII.

### ACCOUNTING

76.     Plaintiffs reincorporate by reference the allegations of Paragraph 1-75 as though fully set forth herein.

77.     OrthAlliance and the Plaintiffs sought to enter into a contractual arrangement whereby OrthAlliance exercised dominion and control, and continues to exercise dominion and control, over the Plaintiffs' accounts.  Furthermore, OrthAlliance drew a substantial amount of monies as a service fee in exchange for services that were not provided in accordance with the terms of the Service Agreement.

78.     OrthAlliance's control over the Plaintiffs' accounts entitles Plaintiffs to a complete accounting, including, but not limited to, amounts OrthAlliance paid to itself as a service fee under the Service Agreement.  Plaintiffs are entitled to recover the amounts paid to OrthAlliance as service fees because the contracts are void and/or voidable and because of OrthAlliance's continued material breaches of the Service Agreement.

## COUNT VIII.

## ATTORNEYS' FEES AND COURT COSTS

79.     Plaintiffs reincorporate by reference the allegations of Paragraph 1-78 as though fully set forth herein.

80.     Plaintiffs are entitled to recover their attorneys' fees and court costs in connection with their claims for declaratory relief, in prosecuting their claims pursuant to the terms and conditions of the Service Agreement, and pursuant to G. L., c. 93A.

81.     Plaintiffs demand a trial by jury on all disputed issues of material fact.

## IX.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiffs pray that the Court, upon trial hereof, grant them the following relief:

a.      A declaration of rights as described above;

b.      Money damages within the jurisdiction of this Court as reasonable compensation for all damages proximately caused by OrthAlliance's fraudulent conduct;

c.      Money damages within the jurisdiction of this Court as reasonable compensation for all damages that were caused by OrthAlliance's continued material breaches of the Service Agreement, including, but not limited to, all costs incurred in seeking comparable service, benefit of the bargain damages, and/or a recoupment of all service fees paid to OrthAlliance;

d.  Money damages within the jurisdiction of this Court as reasonable compensation for OrthAlliance's violation of G. L., c. 93A, including trebled damages because OrthAlliance's conduct was undertaken willfully and knowingly, as well as any other statutory relief available to Plaintiffs;

e.  Rescission of the Service Agreement, at Plaintiffs' option, and a recoupment of all service fees and expenses paid to OrthAlliance.

f.  An accounting of all of Plaintiffs' monies collected, expended or handled by OrthAlliance, including, but not limited to, the total amount of Service Fees collected by OrthAlliance;

g.  Punitive damages in an amount to be determined by the trier of fact;

h.  An award of attorneys' fees and costs reasonably and necessarily incurred in bringing and prosecuting this action;

i.  The maximum amount of pre- and post-judgment interest permitted by law;

j.  Costs of court; and

k.  Such other and further relief as the Court deems equitable.

Respectfully submitted,

John R. Gobel, BBO#196340
GOBEL & HOLLISTER
106 Wendell Avenue
Pittsfield, Massachusetts 01201
Telephone: (413) 443-7337
Facsimile: (413) 499-2981

Of Counsel:
Brian A. Colao – *pro hac vice* application filed
   Texas Bar No. 00793528
Christopher M. LaVigne – *pro hac vice* application filed
   Texas State Bar No. 24026984
LOCKE LIDDELL & SAPP LLP
2200 Ross Avenue, Suite 2200
Dallas, TX 75201
Telephone: (214) 740-8000
Facsimile: (214) 740-8800

COUNSEL FOR PLAINTIFFS