UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| DAVID TOD GARNER, SUELLEN RODEFFER, and SUELLEN RODEFFER & DAVID TOD GARNER, D.D.S., P.A., <br><br>　　Plaintiffs, <br><br>vs. <br><br>ORTHALLIANCE, INC., a Delaware corporation, <br><br>　　Defendant. | § § § § § § § § § § § § § | Case No. 3:03-cv-948-J-25HTS |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Richard Goldstein
  Fla. Bar No. 197319
GOLDSTEIN, TANEN & TRENCH, P.A.
One Biscayne Tower, Suite 3250
Two South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 374-3250
Facsimile: (305) 374-7632

Brian A. Colao – *pro hac vice*
  Texas Bar No. 00793528
Christopher M. LaVigne – *pro hac vice*
  Texas State Bar No. 24026984
LOCKE LIDDELL & SAPP LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
Telephone: (214) 740-8000
Facsimile: (214) 740-8800

COUNSEL FOR PLAINTIFFS

DALLAS:38735/00001:1313253v2

EXHIBIT
A

## TABLE OF CONTENTS

Page

I. INTRODUCTION ....................................................................................................1

II. SUMMARY JUDGMENT EVIDENCE ..................................................................1

III. STATEMENT OF UNDISPUTED FACTS ............................................................2

IV. SUMMARY JUDGMENT STANDARD ................................................................6

V. ARGUMENT AND AUTHORITIES ......................................................................7

    A. The Agreements constitute illegal fee splitting. ..........................................7

        1. Florida law prohibits the payment of a service fee to a practice management company which is not based upon the fair market value of the services provided.............................................................7

        2. OrthAlliance has admitted that its service fee under the Agreements is not based upon the fair market value of the services provided. ......................................................................................8

    B. Because the Agreements are illegal, OrthAlliance's counterclaims against Plaintiffs must fail as a matter of law..............................................12

    C. The covenants not to compete contained in the Agreements are void and unenforceable under Florida law.........................................................14

        1. Covenants not to compete are subject to limited enforcement in Florida..................................................................................................14

        2. The covenants not to compete in the Agreements are unenforceable........15

            a. OrthAlliance does not compete with Plaintiffs................................15

            b. OrthAlliance lacks standing to enforce the covenant not to compete contained in the Employment Agreement..............19

VI. CONCLUSION AND PRAYER ............................................................................19

# TABLE OF AUTHORITIES

## CASES

Page

*Castro v. Sangles,*
637 So. 2d 989 (Fla. 3rd DCA 1994) .................................................................... 13, 14

*Geocaris v. Surgical Consultants, Ltd.,*
302 N.W.2d 76 (Wis. Ct. App. 1981) ........................................................................ 18

*Gibson v. Eberle,*
762 P.2d 777 (Colo. Ct. App. 1988) .......................................................................... 18

*Gonzalez v. Trujillo,*
179 So. 2d 896 (Fla. 3rd DCA. 1965) ........................................................................ 13

*Gregg v. U.S. Industries, Inc.,*
715 F.2d 1522 (11th Cir. 1983) ................................................................................. 14

*Harris v. Gonzalez,*
789 So. 2d 405 (Fla. 4th Dist. Ct. App. 2001) .......................................................... 14

*Hayes v. Altman,*
266 A.2d 269 (Penn. 1970) ........................................................................................ 18

*Herndon v. Waller,*
525 S.E.2d 159 (Ga. Ct. App. 1999) .......................................................................... 18

*Hess v. Gebhard & Co., Inc.,*
808 A.2d 912 (Penn. 2002) ........................................................................................ 18

*Hoffman v. Boyd,* 698 So. 2d 346
(Fla. 4th DCA 1997) .................................................................................................. 13

*Inter-Continental Promotions, Inc. v. Miami Beach First National Bank,*
441 F.2d 1356 (5th Cir. 1971) ................................................................................... 13

*Karpinski v. Ingrasci,*
268 N.E.2d 751 (N.Y. 1971) ..................................................................................... 18

*Katz v. Woltin,*
765 So. 2d 279 (Fla. 4th DCA 2000) .................................................................... 13, 14

*Kentucky Center for Orthodontics, P.S.C. v. OrthAlliance, Inc., et al.,*
Civil Action No. 02-517-KSF (Exhibit 7) ................................................................. 19

DALLAS:38735/00001:1313253v2

*LaRocca v. Howard-Reed Oil Co.*,
   277 S.W.2d 769 (Tex. App. 1955) ........................................................................................ 18

*Lawyers Title Insurance Co. v. JDC (America) Corp.*,
   52 F.3d 1575 (11th Cir. 1995) ................................................................................................ 8

*Local No. 234 of United Association of Journeymen and Apprentices of Plumbing v. Henley & Beckwith, Inc.*,
   66 So. 2d 818 (Fla. 1953) ............................................................................................. 13, 14

*Mark A. Yaffey et. al v. OrthAlliance, Inc.*,
   Case No. 01-3175-CIV .......................................................................................................... 9

*Montsdoca v. Highlands Bank & Trust Co.*,
   95 So. 666 (Fla. 1923) .......................................................................................................... 13

*Orkin Exterminating Co., Inc. v. F.T.C.*,
   846 F.2d 1354 (11th Cir. 1988) ............................................................................................. 8

*Premier Associate Ltd. v. Loper*,
   778 N.E.2d 630 (Ohio Ct. App. 2002) ................................................................................ 18

*Rollins, Inc. v. Parker*
   755 So. 2d 839 (Fla. 5th DCA 2000) .................................................................................. 17

*Schaal v. Race*,
   135 So. 2d 252 (Fla. 2nd DCA 1961) ................................................................................. 14

*Snow et. al v. OrthAlliance, Inc.*
   Case No. BC26093, Superior Court of the State of California (Exhibit 6) ................... 18, 19

*Tusa v. Roffe*,
   791 So. 2d 512 (Fla. 4th DCA 2001) .................................................................................. 20

*Wolf v. James G. Barrie, P.A.*,
   858 So. 2d 1083 (Fla. 2nd DCA 2003) ............................................................................... 17

## STATUTES

Federal Rule of Civil Procedure 56 ............................................................................................. 7

Fla. Stat. Ann. § 466.0285 (2003) .............................................................................................. 16

Fla. Stat. Ann. § 542.335(1)(f) ............................................................................................. 2, 20

64 FL ADC 64B5-17.013 ............................................................................................................ 2

DALLAS:38735/00001:1313253v2

Plaintiffs David Tod Garner ("Dr. Garner"), Suellen Rodeffer ("Dr. Rodeffer"), and Suellen Rodeffer & David Tod Garner, D.D.S., P.A. ("R&G PA")[1] hereby file Plaintiffs' Motion for Summary Judgment, and Brief in Support, as follows:

## I.
## INTRODUCTION.

Plaintiffs seek in this case to prevent OrthAlliance, Inc. ("OrthAlliance") from continuing to violate Florida law by illegally splitting Plaintiffs' professional fees in violation of 64 FL ADC 64B5-17.013 and illegally restraining trade through two unconscionable covenants not to compete in violation of Florida Statutes, § 542.335. OrthAlliance engages in such illegal activity through a complex series of contracts which the parties executed on or about March 7, 1997. As set forth in detail below, these agreements are illegal, and therefore, they are void and unenforceable as a matter of law. Accordingly, Plaintiffs are entitled to summary judgment on Counts I and III of their Amended Complaint.[2] Additionally, in Florida, illegal agreements are void and unenforceable as a matter of law, and therefore, no cause of action, at law or in equity, can be based on the enforcement thereof. Consequently, OrthAlliance's counterclaims against Plaintiffs must also fail as a matter of law.

## II.
## SUMMARY JUDGMENT EVIDENCE

In support of this Motion for Summary Judgment, Plaintiffs hereby file the following summary judgment evidence, which is attached hereto and incorporated herein by reference:

- Declaration of Dr. David Tod Garner and the documents attached thereto as Exhibits 1 and 1A – 1C;

---

[1] Dr. Garner, Dr. Rodeffer, and R&G PA are hereinafter collectively referred to as "Plaintiffs."
[2] After the completion of discovery, Plaintiffs may also independently move for summary judgment on Count II of their Amended Complaint regarding the corporate practice of dentistry. In the event such a motion is necessary, Plaintiffs will properly move for leave of court to file such a motion.

- Declaration of Dr. Suellen Rodeffer and the documents attached thereto as Exhibits 2 and 2A;

- Declaration of Dr. Randall Schmidt and the documents attached thereto as Exhibit 3 and 3A-3B;

- A true and correct copy of excerpts from the prior trial testimony transcript of Steve Toon as Exhibit 4;

- A true and correct copy of excerpts from the prior trial testimony transcript of Sam Westover as Exhibit 5; and

- True and correct copies of various orders from related cases pending around the country as Exhibits 6-7.

## III.
## STATEMENT OF UNDISPUTED FACTS

1. Drs. Garner and Rodeffer are licensed to practice dentistry in the State of Florida and both specialize in the practice of orthodontics. *See* Exhibit 1 at ¶ 2; Exhibit 2 at ¶ 2. R&G PA is the professional association through which Drs. Garner and Rodeffer provide orthodontic care to their patients. *See id.* R&G PA is located in Jacksonville, Florida. *See id.*

2. OrthAlliance is a corporate entity known as a "Practice Management Company" that purports to specialize in providing business and management related services to orthodontic professionals. *See* Exhibit 1 at ¶ 3; Exhibit 2 at ¶ 3.

3. On or about March 7, 1997, Plaintiffs executed a series of agreements with OrthAlliance, including: (1) a "Stock Purchase and Sale Agreement" executed by OrthAlliance and Drs. Garner and Rodeffer (Exhibit 1 at ¶ 5 and Exhibit 1A); (2) a "Service Agreement" executed by OrthAlliance and R&G PA (Exhibit 1 at ¶ 6 and Exhibit 1B); and (3) and two "Employment Agreements," one executed by Dr. Garner and R&G PA (Exhibit 1 at ¶ 8 and Exhibit 1C) and the other by Dr. Rodeffer and R&G PA (Exhibit 2 at ¶ 8 and Exhibit 2A).[3]

---

[3] The Stock Purchase and Sale Agreement, the Service Agreement, and the Employment Agreements are hereinafter collectively referred to as the "Agreements." Furthermore, the Agreements were actually executed with

### Stock Purchase and Sale Agreement

4.  The first contract executed was the Stock Purchase and Sale Agreement, under which Drs. Garner and Rodeffer sold to OrthAlliance their interest in their existing professional association, Rodeffer & Garner, D.D.S., P.A. ("Old PA"). *See* Exhibit 1A. As a condition to executing the Stock Purchase and Sale Agreement, Drs. Garner and Rodeffer were required to transform Old PA into a general business corporation and form a new professional association (R&G PA) through which they would practice orthodontics and which would be obligated to execute the Service Agreement with OrthAlliance and the Employment Agreements with Drs. Garner and Rodeffer. *See id.* at § 6.11. The effect of this Stock Purchase and Sale Agreement was to transfer ownership over substantially all of Old PA's assets to OrthAlliance. *See* Exhibit 1 at ¶ 5; Exhibit 2 at ¶ 5. The assets sold to OrthAlliance were then leased back to R&G PA under the terms of the Service Agreement. *See id.*

### Service Agreement

5.  The Service Agreement was executed by R&G PA and OrthAlliance. See Exhibit 1B. The Service Agreement obligates OrthAlliance to act as R&G PA's "sole and exclusive business manager" and to provide "comprehensive practice management, financial, and marketing services, and such facilities, equipment, and support personnel" which R&G PA reasonably required. *See id.* at § 1.1. Section 1.2-1.12 of the Service Agreement delineates approximately twenty-five specific services which OrthAlliance was required to provide to R&G PA. *See id.* at §§ 1.2-1.12.

6.  In exchange for purportedly providing these services, OrthAlliance was obligated to collect as a "service fee" 17% of R&G PA's adjusted gross revenue, plus an additional 25% of

---

a company known as U.S. Orthodontic Care, Inc, ("USOC"), which is a predecessor in interest to OrthAlliance. *See* Exhibit 1 at ¶ 4; Exhibit 2 at ¶ 4. OrthAlliance has assumed all of USOC's responsibilities under the Agreements, and therefore, except where required by context, USOC will be referred to herein as OrthAlliance. *See id.*

any reduction in R&G PA's overhead. *See id.* at § 3.1. Significantly, the amount of the service fee when originally established was dependent not upon the fair market value of the services provided, but rather upon the amount of consideration OrthAlliance paid to R&G PA under the separate Stock Purchase and Sale Agreement. *See* Exhibit 1 at ¶ 7; Exhibit 2 at ¶ 7; Exhibit 3 at ¶¶ 4-5; Exhibit 4 at p. 146:16-147:7; Exhibit 5 at p. 77:15-78:1; 87:14-87:22. For example, if R&G PA agreed to pay a 17% service fee, instead of a 14% service fee, then OrthAlliance would agree to pay Drs. Garner and Rodeffer more consideration under the Stock Purchase and Sale Agreement, even though OrthAlliance was purchasing the exact same assets. *See id.*

7. As OrthAlliance's own executive officers have testified under oath, the service fees charged were not in exchange for the services provided, but rather were a return on its investment under the Purchase and Sale Agreement. *See* Exhibit 4 at p. 146:16-147:7; Exhibit 5 at p. 77:15-78:1; 87:14-87:22. In fact, OrthAlliance's own CEO has repeatedly reaffirmed that the service fee charged by OrthAlliance is not commensurate with the fair market value of the services provided, and that the payment of the service fee only makes sense when it is considered in connection with the upfront consideration the doctors received under the separate Stock Purchase and Sale Agreements. *See* Exhibit 3 at ¶ 5; Exhibit 3B at p. 2.

### The Employment Agreement

8. The last of the agreements executed by the parties were the Employment Agreements, which were executed by R&G PA and Drs. Garner and Rodeffer. *See* Exhibit 1 at ¶ 8 and Exhibit 1C; Exhibit 2 at ¶ 8 and Exhibit 2A. OrthAlliance claims to be an express third-party beneficiary of the Employment Agreements, even though it is not identified as such in the contract. *See* OrthAlliance's Amended Counterclaims at p. 23-24. Under the Employment Agreements, Drs. Garner and Rodeffer agreed to operate as employees of R&G PA for a five-

year period, subject to being renewed for successive one-year terms. *See* Exhibit 1C at § 2; Exhibit 2A at § 2.

9.   While Drs. Garner and Rodeffer were subject to the terms of the Employment Agreements, they purportedly were not permitted to practice orthodontics at any other facility or for the benefit of any other patients. *See* Exhibit1 C at § 1; 2A at § 1. In addition, Drs. Garner and Rodeffer were required to devote their "full business time, attention, skill, and effort exclusively" to their orthodontic obligations with R&G PA. *See id.*

### The Covenants Not to Compete

10.   The Agreements contain two covenants not to compete. The first covenant not to compete is contained at Section 2.9 the Service Agreement. This covenant states as follows:

> During the term of this Agreement, [R&G PA], and any of its shareholders, agrees not to establish, develop or open any office for the provision of orthodontic services within a ten (10) mile radius of any of the Centers covered by this Agreement (the "Area of Dominant Influence") without the express written consent of [OrthAlliance]. For a period of two (2) years following the termination of this Agreement, [Devito P.A.] and any of its shareholders shall be prohibited within the Area of Dominant Influence (i) from advertising in print (except for yellow page advertising and announcements for the opening of a practice) or electronic media of any kind, (ii) from soliciting in any manner patients, orthodontists or staff associated with the Centers, and (iii) from soliciting any referrals from any dentist who referred one or more patients to the Center within the three (3) years prior to the date of such termination. ...

*See* Exhibit 1B at § 2.9.

11.   Independent of this covenant not to compete, the Service Agreement also contains a separate non-disclosure covenant which prohibits Plaintiffs from disclosing any purported confidential or trade secret information made available to them by OrthAlliance, and which further requires Plaintiffs to return such information to OrthAlliance upon termination of the Agreements. *See id.* at § 2.7.

12. The other covenant not to compete is contained in the Employment Agreements. Specifically, Section 5(b) of the Employment Agreements states that:

> For a period of two years following the termination of your employment, you may not (i) engage in any newspaper, print, radio, television or electronic advertising for your orthodontic or dental services in the broadcast coverage area of television stations in the market area where the Center covered by this agreement is located; (ii) actively solicit or directly market your orthodontic or dental services (or those of any other orthodontic entity with which you are affiliated or employed) to anyone who was your patient (or a patient of the orthodontic entity) during the term of this agreement, (iii) provide orthodontic or dental services to any patients within a ten (10) mile radius of any Center(s)'s, (iv) actively solicit the Center's staff or patients, or (v) solicit referrals from any dentist who referred one or more patients from any dentist or the orthodontic entity within the two years prior to such termination.

Exhibit 1C at § 5(b); Exhibit 2A at § 5(b).

### Plaintiffs Orthodontic Practice

13. Drs. Garner and Rodeffer have received little if any training from OrthAlliance, and have not been provided with any secret or special techniques regarding the practice of orthodontics. *See* Exhibit 1 at ¶ 9; Exhibit 2 ¶ 9. The materials OrthAlliance provided to Drs. Garner and Rodeffer and R&G PA have already been returned to OrthAlliance or have been given to counsel in connection with this litigation. *See id.* Drs. Garner and Rodeffer and R&G PA are not in possession of any trade secret or confidential information belonging to OrthAlliance. *See id.*

### IV.
### SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there are no genuine issues at to any material fact and that the moving party is entitled to judgment as a matter of law. The legal effect of a contract is a question of law that may properly be determined

on summary judgment. *See Lawyers Title Ins. Co. v. JDC (America) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995). Here, the Court is presented with the question of the legality of the Agreements. The language of the Agreements is not in dispute, and therefore, their legality is a proper subject for summary judgment. *See Orkin Exterminating Co., Inc. v. F.T.C.*, 846 F.2d 1354, 1360 (11th Cir. 1988).

## V.
## ARGUMENT AND AUTHORITIES

As set forth in detail below, the Agreements are illegal in their entirety because they constitute illegal fee splitting. Thus, the Agreements are void and unenforceable as a matter of law, and therefore, all of OrthAlliance's counterclaims against Plaintiffs must fail. In addition, the covenants not to compete contained in the Agreements are independently unenforceable because they constitute illegal restraints on trade.

### A. The Agreements constitute illegal fee splitting.

#### 1. Florida law prohibits the payment of a service fee to a practice management company which is not based upon the fair market value of the services provided.

Fee splitting is illegal in the State of Florida. Specifically, Rule 64B5-17.013(3)(f) of the Florida Administrative Code expressly states that a contract between a licensed dentist and a practice management company, such as OrthAlliance, cannot "directly or indirectly condition the payment or amount of the management fee on the referral of patients, *and in addition, the management fee shall reasonably relate to the fair market value of the services provided.*" *Id.* (emphasis added). The inclusion of the phrase "in addition" makes it clear that this Rule prohibits two types of dental fee splitting: (1) service fees conditioned on the referral of patients; and "in addition" (2) service fees which are not reasonably related to the fair market value of the services provided under a management services contract.

## 2. OrthAlliance has admitted that its service fee under the Agreements is not based upon the fair market value of the services provided.

Regardless of the manufactured claims it may raise in response to this Motion, OrthAlliance has repeatedly admitted that the service fees it collects under its Service Agreement are not based upon the fair market value of the services provided, but rather upon the amount of consideration it paid to affiliated orthodontists, such as Drs. Garner and Rodeffer, under the Stock Purchase and Sale Agreement. Specifically, under OrthAlliance's contracts, an affiliated orthodontist can receive more up front consideration under the Stock Purchase and Sale Agreement (regardless of the assets actually purchased) if he or she agrees to pay a higher monthly service fee under the Service Agreement (regardless of the fair market value of the services actually provided).

These facts are not based upon hypothetical conjecture or a strained legal reading of the Agreements, but rather upon the repeated admissions of OrthAlliance. For example, during the trial of a related lawsuit styled Mark A. Yaffey et. al v. OrthAlliance, Inc., Case No. 01-3175-CIV, in the United States District Court for the Southern District of Florida, Miami Division, OrthAlliance's executives admitted that the service fee charged under the Service Agreement was inextricably tied to the consideration OrthAlliance paid under the separate Stock Purchase and Sale Agreement. Specifically, Steve Toon, OrthAlliance's Executive Vice President and Chief Development Officer, testified:

> Q. If the contract specified services to be provided and Dr. Yaffey is to pay fourteen percent for those, and you have told this jury that the recruitment activities that you and Mr. Teeples and Mr. Eckhardt undertook were not part of the service contract, then they have nothing to do with the fourteen percent. Is that correct?
>
> A. *The fourteen percent was not only for services, but for the up front dollars and for stock that Dr. Yaffey received.*

> Q. *The fourteen percent was, in part, a return on the investment that OrthAlliance made with that upfront payment?*
>
> A. *Yes.*
>
> Q. It was a way for OrthAlliance to assure itself, knowing what Dr. Yaffey's revenue had been for the past, of an amount of money that they would receive into the future. Is that correct?
>
> A. Hopefully, yes.

Exhibit 4 at p. 146:16-147:7 (emphasis added).

Mr. Toon's testimony was corroborated by Sam Westover, the former CEO of OrthAlliance, who likewise testified during the *Yaffey* trial that the purpose of the Stock Purchase and Sale Agreement was to "invest" in the orthodontists' professional fees, with a return guaranteed by a service fee that was inextricably tied with this upfront consideration:

> Q. Now, the service agreement by itself standing alone obligates OrthAlliance to provide services to Dr. Yaffey in return for the fourteen percent fee. Is that correct?
>
> A. Yes.
>
> Q. This service agreement does not make any reference to any money that Dr. Yaffey got up front. Correct?
>
> A. It does not, but *we would not have signed the service agreement* if he had not signed the other agreement, neither would he. He would not have signed the service agreement If we had not paid him a million dollars up front. I am sure of that.
>
> . . .
>
> Q. Would OrthAlliance have entered into the purchase agreement unless the new entity entered into the twenty year service or consulting agreement with it?
>
> A. No. *There would be no return on our investment.* We would pay $1,000,000, and then there would be no revenue coming back to us.
>
> Q. So the contracts are linked?

> A.  They had to be. We would not have spent $1,000,000 without an opportunity to have income coming back.

Exhibit 5 at p. 77:15-78:1; 87:14-87:22 (emphasis added).

Applying the testimony of OrthAlliance's executives to the facts of this case, it is clear that OrthAlliance's service fee is a means of investing in the future income stream of professional orthodontic practices. Specially, OrthAlliance purchased the assets of Old PC with shares of OrthAlliance stock valued at 120% of Old PC's 1996 adjusted gross revenue; although OrthAlliance could have purchased the exact same assets for 100% of Old PC's 1996 adjusted gross revenue if R&G PA had agreed to a 14% service fee instead of a 17% service fee. *See* Exhibit 1 at ¶ 7; Exhibit 2 at ¶ 7; Exhibit 3 at ¶ 4. Because R&G PA elected to pay a 17% service fee, OrthAlliance agreed to pay the higher amount for the assets it purchased under the Stock Purchase and Sale Agreement. *See* Exhibit 1A at § 2.1  Accordingly, Drs. Garner and Rodeffer sold the assets of Old PC to OrthAlliance for shares of OrthAlliance stock valued at $1,930,440. *See* Exhibit 3A at p. 39. This amount of consideration is significant given that OrthAlliance valued the assets and liabilities purchased under the Stock Purchase and Sale Agreement at only $289,126, or a mere 15% of the amount it actually paid to acquire such assets. *See id.*

OrthAlliance's service fee is based on the elevated consideration it paid under the Stock Purchase and Service Agreement; not upon the fair market value of the services it actually provides to R&G PA. OrthAlliance has also admitted this fact. For example, during an OrthAlliance practice enhancement seminar in Orlando, Florida on or about April 6, 2000, Sam Westover, OrthAlliance's then acting Chief Executive Officer, stated.

> So, we are expanding the service[s] offer[ed] and, as we get larger, we've got more resources in order to be able to do that. So, but is it enough? And this is, this is the real quandary. Is, *is there any way in the world that we could ever*

> *provide you services that made you feel like you were getting $170,000 worth of value during that year? And I'm not sure that's possible.* I think, I think, the best way to do this is to have me keep reminding everyone, we got consideration. We're earning more than before; let's not lose track of that. And you're getting these other services, in addition. We can't just look at one piece of that. You really need to look at all three. And if you consider all three, it turns out to be a terrific deal for you and it's a terrific deal for us as well. *But if you just want to take any one of those pieces, you can't justify [the service fee] in isolation. I think you need to look at all three.*
>
> ...
>
> Theoretically, if we really could produce services that you felt like were worth $170,000 a year – where at the end of the year, you could say "I got these 20 things and, boy, what a good deal. It was probably worth more than $170,000. I'm, I'm really happy with that." *If that was the case we wouldn't have to pay any consideration at all. Right?* We could just offer those services to people and, and they would pay us the 17% of revenue.

Exhibit 3 at ¶ 5.

Additionally, during a meeting for OrthAlliance's Clinical Advisory Committee in San Diego, California on November 2, 2000, Mr. Westover made his most blatant admission that OrthAlliance's service fee was not commensurate with the value of the services actually provided. The "Minutes" from this meeting reflect as follows:

> Sam Westover asked the members present, "What is it that we should be providing to our members?" The obvious answer from members in attendance was that *OrthAlliance services should be equal to the service fee. Mr. Westover stated that that is financially impossible.* We can provide things that you cannot get anywhere else. We want to add value *but it must be within reason.*

Exhibit 3B at p. 2.

These admissions readily establish that OrthAlliance's service fees are not reasonably related to the fair market value of the services provided. Rather, OrthAlliance's "service fees" are a means in which it shares in the professional fees generated by affiliated orthodontists, such as Drs. Garner and Rodeffer. The extent of OrthAlliance's fee splitting is highlighted by the fact that virtually all of the costs associated with providing "services" to R&G PA are charged back the practice as a "Center Expense." *See* Exhibit 1B at §§ 3.2-3.3. For example, the costs

associated with having an OrthAlliance consultant come out and visit R&G PA is charged back to the practice as a Center Expense, which R&G PA is required to pay in addition to the 17% service fee. *See id.* Thus, R&G PA bears the expense of the services purportedly provided by OrthAlliance, while OrthAlliance gets to pocket the 17% service fee almost entirely as pure split in profits.

Based on the foregoing, it is clear that the Agreements at issue in this case violate Rule 64B5-17.013(3)(f), and therefore, constitutes illegal fee splitting. Accordingly, Plaintiffs respectfully request that Court declare the Agreements to be illegal, void, and unenforceable.

**B.    Because the Agreements are illegal, OrthAlliance's counterclaims against Plaintiffs must fail as a matter of law.**

Under Florida law, it is well established that where a contract is illegal, "no action may be brought on it, whether in law or in equity." *Katz v. Woltin*, 765 So.2d 279, 280 (Fla. 4th DCA 2000); *see also Inter-Continental Promotions, Inc. v. Miami Beach First Nat. Bank*, 441 F.2d 1356, 1361 (5th Cir. 1971) ("the cases are legion that a contract against public policy may not be made the basis of any action in law or in equity."); *Local No. 234 of United Ass'n of Journeymen and Apprentices of Plumbing v. Henley & Beckwith, Inc.*, 66 So. 2d 818, 823 (Fla. 1953) ("[a]greements in violation of public policy are void because they have no legal sanction and establish no legitimate bond between the parties."); *Montsdoca v. Highlands Bank & Trust Co.*, 95 So. 666, 668 (Fla. 1923) ("The doctrine[] of estoppel [does] not in general apply in transactions that are forbidden by statute or that are contrary to public policy."); *Hoffman v. Boyd*, 698 So.2d 346, 349 (Fla. 4th DCA 1997) ("The fact that [a party] may have acted dishonorably does not prevent him from asserting the illegality of the very contract he freely and voluntarily entered."); *Castro v. Sangles*, 637 So.2d 989, 990 (Fla. 3rd DCA 1994) ("It is, of course, the general rule that no action may be maintained on an "illegal" contract."); *Gonzalez v.*

*Trujillo*, 179 So.2d 896, 897-98 (Fla. 3rd DCA. 1965) ("The principle that courts will not enforce illegal contracts is well established."); *Schaal v. Race,* 135 So.2d 252, 257 (Fla. 2nd DCA 1961) ("An illegal contract is, as a rule, void -- not merely voidable -- and can be the basis of no judicial proceeding."). Accordingly, OrthAlliance's counterclaims against Plaintiffs must fail as a matter of law. *See Katz v. Woltin*, 765 So.2d 279, 280 (Fla. 4th DCA 2000) (cannot breach an illegal contract); *Gregg v. U.S. Industries, Inc.*, 715 F.2d 1522, 1531 (11th Cir. 1983).

In Florida, courts generally leave the parties to an illegal contract where it finds them. *See Local No. 234 v. Henley & Beckwith, Inc.*, 66 So.2d 818, 821 (Fla. 1953) ("when a contract or agreement, express or implied, is tainted with the vice of ... illegality, no alleged right founded upon the contract or agreement can be enforced in a court of justice.... Where the parties to such an agreement are *in pari delicto* the law will leave them where it finds them; relief will be refused in the courts because of the public interest"); *Harris v. Gonzalez*, 789 So.2d 405, 409 (Fla. 4th Dist. Ct. App. 2001) ("A contract which violates a provision of the constitution or a statute is void and illegal, and, will not be enforced in our courts. Where the parties to such an agreement are *in pari delicto* the law will leave them where it finds them; relief will be refused in the courts because of public interest"); *Castro v. Sangles*, 637 So.2d 989, 991 (Fla. 3rd Dist. Ct. App. 1994) ("The courts will not in general aid either party to enforce an illegal agreement, but will leave the parties where they place themselves with reference to such illegal agreement, except where the law or public policy requires action by the courts, or where the parties are not *in pari delicto* ...."). Because the Agreements in this case are illegal, the proper remedy is for the Court to leave the parties where it finds them.

C. <u>The covenants not to compete contained in the Agreements are void and unenforceable under Florida law.</u>

The Agreements at issue in this case contain two unusual covenants not to compete. The covenants are found at Section 2.9 of the Service Agreement and Section 5(b) of the Employment Agreements. These covenants purport to restrict Plaintiffs from: (1) practicing orthodontics or dentistry within ten (10) miles of any existing office (the "Zone of Dominant Influence"); (2) advertising in print or "electronic media" within the "broadcast coverage area" of the market where any existing offices are located; (3) soliciting patients, staff, and orthodontists of R&G PA; and (4) soliciting referrals from any dentist which has referred a patient to R&G PA within the previous three (3) years. These covenants are independent from those covenants in the Agreements prohibiting Plaintiffs from disclosing OrthAlliance's alleged trade secret or confidential information. Rather, these covenants relate solely to Plaintiffs' ability to practice clinical orthodontics, an activity which OrthAlliance does not, and by law cannot, have any legitimate interest in restricting. Thus, as set forth in detail below, these covenants not to compete are void and unenforceable.

1. <u>Covenants not to compete are subject to limited enforcement in Florida.</u>

Covenants not to compete entered into after July 1, 1996, are governed by Section 542.335, Florida Statutes. *See* Section 542.335(3), *Fla. Stat.* (2002). Because the covenants not to compete at issue in this case were entered into in 1997, they are governed by Section 542.335. Under this statute, covenants not to compete are valid and enforceable only if they are: (1) reasonable in "time, area, and line of business;" (2) set forth in writing and signed by the person against whom enforcement is sought; (3) supported by one or more legitimate business interests; and (4) narrowly drafted so as to reasonably protect such legitimate business interests. *See*

Section 542.335(1)(a)-(c), *Fla. Stat.* (2002). Covenants which fail to satisfy these elements are unlawful, and therefore, void and unenforceable. *See id.*

### 2. The covenants not to compete in the Agreements are unenforceable.

As set forth in detail below, the covenants at issue in this case are void and/or unenforceable because: (1) OrthAlliance and Plaintiffs are not in the same "line of business;" and (2) OrthAlliance lacks standing to enforce the covenant not to compete contained in the Employment Agreements.

#### a. OrthAlliance does not compete with Plaintiffs.

The covenants at issue herein are void and unenforceable because OrthAlliance does not compete with Plaintiffs, and therefore, the covenants are *per se* unreasonable as to the "line of business" sought to restrained. The undisputed summary judgment evidence establishes that Drs. Garner and Rodeffer and R&G PA are in the business of providing orthodontic care to patients, but not in the business of providing practice management services to orthodontists. *See* Exhibit 1 at ¶¶ 2-3; Exhibit 2 at ¶¶ 2-3. In contrast, the undisputed summary judgment evidence establishes that OrthAlliance is in the business of providing practice management services to orthodontists, but not in the business of providing orthodontic care to patients. *See id.* In fact, OrthAlliance is statutorily prohibited from practicing dentistry in the State of Florida. *See* FLA. STAT. ANN. § 466.0285 (2003). Accordingly, as a matter of law, there can be no competition between the parties. Yet, OrthAlliance purports to have the right, under the covenants not to compete, to prohibit Plaintiffs from practicing orthodontics, marketing their services, and soliciting their patients.[4] Because OrthAlliance and Plaintiffs are not in the same line of business, however, the covenants are unenforceable.

---

[4] The unenforceability of the covenants not to compete is highlighted by the fact that they only purport to prohibit Plaintiffs from competing with OrthAlliance in the provision of orthodontic services. It speaks volumes

Section 542.335(1) expressly provides that a covenant not to compete must be reasonable as to the "line of business" sought to be restrained. Interpreting a nearly identical provision in the statute governing covenants not to compete which were entered into prior to 1996, the Florida Second District Court of Appeals recently noted, "If the employer is not in a like business, it has no legitimate interest in protecting against competition in that business." *Wolf v. James G. Barrie, P.A.*, 858 So.2d 1083, 1085 (Fla. 2nd DCA 2003). The court further noted that the existence of competition between the coventor and the coventee is "a condition precedent to the validity of [a] noncompete agreement...." *Id.* at 1086 (citing *Hapney v. Central Garage, Inc.*, 579 So.2d 127, 131 (Fla. 2nd DCA 1991)).

Moreover, in determining whether a covenant not to compete is reasonable as to the "line of business," it is important to note that at least one Florida court has suggested that this phrase must be interpreted narrowly. In *Rollins, Inc. v. Parker*, a Florida Court of Appeals was asked to determine whether Sears and Orkin, who are both in the pest management industry but who use different methods of extermination, were competitors. 755 So.2d 839, 842 (Fla. 5th DCA 2000). The court held that they were not: "Sears and Orkin were not direct competitors in that, although they both operated to exterminate pests, their methods of doing business were completely different." *Id.* Accordingly, the court concluded that the covenant not to compete at issue was unenforceable. *See id.* at 842. Although the First District Court of Appeals was applying Georgia law, it did suggest that it would have reached the same conclusion even if it had been applying Florida law. *See id.* at 841 n.2 ("the common law rule in Georgia is not unlike the provisions of section 542.335, Florida Statutes (1997), which recognizes the validity of such

---

about the impropriety of these covenants that they do not prevent Plaintiffs from opening a practice management company and entering into direct competition with OrthAlliance. The covenants therefore have no bearing on OrthAlliance's legitimate interests in preventing competition in the business of practice management. They merely seek to unreasonably, and without cause, burden the practice of orthodontics.