restrictive covenants which protect an employer's 'legitimate business interests' and which 'are reasonable in time, area and line of business.'")[5]

In this case, OrthAlliance cannot establish the existence of competition between itself and Plaintiffs, and therefore, cannot establish that the covenants are reasonable as to the "line of business" sought to be restrained. This court would not be the first to reach such a conclusion. In a nearly identical lawsuit styled *Snow et. al v. OrthAlliance, Inc.*, a Superior Court of the State of California declared that OrthAlliance did not have a legitimate business interest in restraining orthodontists from providing orthodontic care. *See* Case No. BC26093, Opinion and Order on Plaintiffs' Motion for Summary Adjudication (First and Third Causes of Action), December 2, 2002 (Exhibit 6). In declaring that OrthAlliance and the affiliated practices were not in a "like business," and therefore, that the covenants not to compete were unenforceable, the *Snow* court stated:

> The core of what a dentist does is what he is licensed to do: provide health care and practice dentistry. OrthAlliance does not and cannot practice dentistry or employ dentists or orthodontists. While a dentist or orthodontist, as an adjunct to his or her practice, may need to perform scheduling, billing, purchasing, hiring, or

---

[5] Several other jurisdictions have also held that actual competition is a prerequisite to the enforcement of a covenant not to compete. For instance, Georgia courts have declared that covenants not to compete are invalid in the absence of actual competition. *See Herndon v. Waller*, 525 S.E.2d 159, 161 (Ga. Ct. App. 1999) (holding that a covenant not to compete between a practicing veterinarian and a retired, inactive veterinarian was not reasonable because of the lack of actual competition between the parties). Wisconsin and New York courts have also held that actual competition is a prerequisite to an enforceable covenant not to compete. *See Geocaris v. Surgical Consultants, Ltd.*, 302 N.W.2d 76, 78 (Wis. Ct. App. 1981) ("Surgical Consultants has proven only that it needed to restrain Geocaris from performing surgery. It has offered no proof that Geocaris' practice as a physician, *exclusive of surgery*, would compete with its surgical practice.... The restraint was, therefore, not reasonably necessary") (emphasis added); *Karpinski v. Ingrasci*, 268 N.E.2d 751, 754 (N.Y. 1971) ("[I]t is not reasonable for a man to be excluded from a profession for which he has been trained when he does not compete with his former employer by practicing it"). Numerous other courts have similarly concluded that a covenant not to compete is unenforceable where an entity is no longer engaged in the business sought to be restrained. *See Premier Assoc. Ltd. v. Loper*, 778 N.E.2d 630, 636 (Ohio Ct. App. 2002) ("an employer which abandons its business may not enforce a covenant not to compete"); *Hess v. Gebhard & Co., Inc.*, 808 A.2d 912, 923 (Penn. 2002) (holding that employer no longer has a protectable business interest in preventing competition when it no longer engages in the business covered by the noncompete covenant); *Hayes v. Altman*, 266 A.2d 269, 272 (Penn. 1970) ("having sold his practice, [the employer] need not worry about competition"); *Gibson v. Eberle*, 762 P.2d 777, 779 (Colo. Ct. App. 1988) ("covenantee's right to enforce [a covenant not to compete] ends with the termination or abandonment of the business"); *LaRocca v. Howard-Reed Oil Co.*, 277 S.W.2d 769, 772-73 (Tex. App. 1955) ("the proper test to be applied is whether the interest which the covenant was designed to protect is still outstanding in the covenantee").



other administrative or clerical duties (or hire others to perform such duties for him or her), these functions are merely secondary to his or her business, which is the practice of dentistry. By contrast, the core of what OrthAlliance does is to provide clerical and administrative services to assist dentists in these collateral aspects of their practice.

If OrthAlliance could enforce the covenant not to compete with respect to the individual plaintiffs, a business that is not controlled by medical professionals would have control over the employment of medical professionals. But corporations that are "purely commercial enterprises" may not control the employment of licensed medical professionals. The clinical practice of dentistry, which the individual plaintiffs are licensed to perform, is not a "like business" as compared to the business of OrthAlliance.

*Id.* at pp. 9-10 (internal citations omitted).

Likewise, the United States District Court for the Eastern District of Kentucky has also invalidated OrthAlliance's covenants not to compete on the basis that there is no competition between OrthAlliance and its affiliated orthodontists. Specifically, in *Kentucky Center for Orthodontics, P.S.C. v. OrthAlliance, Inc., et al.*, Civil Action No. 02-517-KSF, Opinion and Order dated July 30, 2004 (Exhibit 7), the Eastern District of Kentucky analyzed the applicability of OrthAlliance's covenants not to compete and concluded:

> Since [Kentucky Centers for Orthodontics] and Drs. Durbin and Huang [the owners of Kentucky Centers for Orthodontics] provide licensed orthodontic services and [OrthAlliance] provides practice management services to orthodontic practices, [OrthAlliance] can not enforce the covenant not to compete in the Employment Agreement. The provision of licensed orthodontic services does not compete with [OrthAlliance's] provision of practice management services to orthodontic practices, therefore, the Court declines to enforce this clause.

*Id.* at p. 17.

The *Snow* and *Kentucky Centers* cases are highly persuasive because they deal with the same issues, the same alignment of parties, and the same covenants not to compete. Moreover, the central premise of *Snow* and *Kentucky Center's* holdings is that entities which are not engaged in a "like business" cannot enforce restrictive covenants against one another. This

premise is entirely consistent with the requirement under Florida law that a restrictive covenant must be reasonable as to the "line of business" sought to be restrained.

Because there is no competition between Plaintiffs and OrthAlliance, OrthAlliance does not have, and could not have, a legitimate business interest in seeking to restrain Plaintiffs from providing orthodontic care. As a result, there is no genuine issue of material fact that the covenants not to compete void and unenforceable as a matter of law.

### b. OrthAlliance lacks standing to enforce the covenant not to compete contained in the Employment Agreement.

Under Florida law, third-party beneficiaries can enforce covenants not to compete only so long as (1) the restrictive covenant expressly identifies the person as a third-party beneficiary of the contract and expressly states that the restrictive covenant is intended for the benefit of such person; and (2) in the case of an assignee or successor, the restrictive covenant expressly authorizes enforcement by a party's assignee or successor. *See* Fla. Stat. Ann. § 542.335(1)(f). In the case at bar, OrthAlliance is not expressly identified as a third-party beneficiary of the covenants not to compete in the Employment Agreements, and therefore, cannot enforce the terms therein. *See Tusa v. Roffe*, 791 So. 2d 512, 514 (Fla. 4th DCA 2001). Accordingly, summary judgment as to the enforceability of these is appropriate.

## VI.
## CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment; declare that the Agreements are illegal and unenforceable as a matter of law; dismiss with prejudice OrthAlliance's counterclaims against Plaintiffs; declare OrthAlliance's covenants not to compete to be void and unenforceable as a

matter of law; award Plaintiffs their costs and attorneys' fees; and grant such other and further relief at law or in equity to which Plaintiffs may be entitled.

Respectfully submitted,

*[signature]*

Richard Goldstein
Fla. Bar No. 197319
GOLDSTEIN, TANEN & TRENCH, P.A.
One Biscayne Tower, Suite 3250
Two South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 374-3250
Facsimile: (305) 374-7632

Brian A. Colao – *pro hac vice*
 Texas Bar No. 00793528
Christopher M. LaVigne – *pro hac vice*
 Texas State Bar No. 24026984
LOCKE LIDDELL & SAPP LLP
2200 Ross Avenue, Suite 2200
Dallas, TX 75201
Telephone: (214) 740-8000
Facsimile: (214) 740-8800

COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on this 30th day of August, 2004 to the following counsel of record:

Via Certified Mail:
Samuel R. Mandelbaum
Mandelbaum & Fitzsimmons, P.A.
One Tampa City Center, 27th Floor
PO Box 3373
Tampa, Florida 33601-3373.

Via Certified Mail:
Scott Clearman
McClanahan & Clearman, LLP
4100 Bank of America Center
700 Louisiana
Houston, Texas 77002

*[signature]*
Christopher M. LaVigne

B

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| GREGORY P. SCOTT and GREGORY P. SCOTT, D.D.S., P.A., <br><br> Plaintiffs, <br><br> vs. <br><br> ORTHALLIANCE, INC., <br><br> Defendant. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § |

Case No. 8:03-cv-2334-EAK-MAP

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Richard Goldstein
 Fla. Bar No. 197319
GOLDSTEIN, TANEN & TRENCH, P.A.
One Biscayne Tower, Suite 3250
Two South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 374-3250
Facsimile: (305) 374-7632

Brian A. Colao – *pro hac vice*
 Texas Bar No. 00793528
Christopher M. LaVigne – *pro hac vice*
 Texas State Bar No. 24026984
LOCKE LIDDELL & SAPP LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
Telephone: (214) 740-8000
Facsimile: (214) 740-8800

**COUNSEL FOR PLAINTIFFS**

38735:00001 : DALLAS : 1327212.1

EXHIBIT B

## TABLE OF CONTENTS

|     |     | Page |
| --- | --- | --- |
| I. | INTRODUCTION | 1 |
| II. | SUMMARY JUDGMENT EVIDENCE | 1 |
| III. | STATEMENT OF UNDISPUTED FACTS | 2 |
| IV. | SUMMARY JUDGMENT STANDARD | 6 |
| V. | ARGUMENT AND AUTHORITIES | 7 |
|     | A. The Agreements constitute illegal fee splitting. | 7 |
|     |    1. Florida law prohibits the payment of service fees that are not based upon the fair market value of the services provided. | 7 |
|     |    2. OrthAlliance has admitted that its service fee under the Agreements is not based upon the fair market value of the services provided. | 8 |
|     | B. Because the Agreements are illegal, OrthAlliance's counterclaims against Plaintiffs must fail as a matter of law. | 12 |
|     | C. The covenants not to compete contained in the Agreements are void and unenforceable under Florida law. | 14 |
|     |    1. Covenants not to compete are subject to limited enforcement in Florida. | 14 |
|     |    2. The covenants not to compete in the Agreements are unenforceable. | 15 |
|     |       a. OrthAlliance does not compete with Plaintiffs. | 15 |
|     |       b. OrthAlliance lacks standing to enforce the covenant not to compete contained in the Employment Agreement. | 19 |
| VI. | CONCLUSION AND PRAYER | 20 |

## TABLE OF AUTHORITIES

### CASES

Page

*Advanced Risk Managemnt, Inc. v. Prout*,
647 So.2d 911 (Fla. 4th DCA 1994) ...........................................................................................7

*Castro v. Sangles*,
637 So. 2d 989 (Fla. 3rd DCA 1994) ........................................................................................12

*Dows v. Nike, Inc.*,
846 So.2d 595 (Fla. 4th DCA 2003) .........................................................................................13

*Erfman v. department of professional regulation*,
577 So.2d 710 (Fla. 5th 1991) ....................................................................................................7

*Geocaris v. Surgical Consultants, Ltd.*,
302 N.W.2d 76 (Wis. Ct. App. 1981) ........................................................................................17

*Gibson v. Eberle*,
762 P.2d 777 (Colo. Ct. App. 1988) ..........................................................................................17

*Gonzalez v. Trujillo*,
179 So. 2d 896 (Fla. 3rd DCA. 1965) .......................................................................................12

*Gregg v. U.S. Industries, Inc.*,
715 F.2d 1522 (11th Cir. 1983) .................................................................................................13

*Hapney v. Central Garage, Inc.*,
579 So.2d 127 (Fla. 2d DCA 1991) ..........................................................................................16

*Harris v. Gonzalez*,
789 So. 2d 405 (Fla. 4th Dist. Ct. App. 2001) ..........................................................................12

*Hayes v. Altman*,
266 A.2d 269 (Penn. 1970) ........................................................................................................17

*Herndon v. Waller*,
525 S.E.2d 159 (Ga. Ct. App. 1999) .........................................................................................17

*Hess v. Gebhard & Co., Inc.*,
808 A.2d 912 (Penn. 2002) .......................................................................................................17

*Hoffman v. Boyd*, 698 So. 2d 346
(Fla. 4th DCA 1997) .................................................................................................................12

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT—Page ii
38735:00001 : DALLAS : 1327212.1

*Inter-Continental Promotions, Inc. v. Miami Beach First National Bank,*
   441 F.2d 1356 (5th Cir. 1971) ..................................................................................... 12

*Karpinski v. Ingrasci,*
   268 N.E.2d 751 (N.Y. 1971) ......................................................................................... 17

*Katz v. Woltin,*
   765 So. 2d 279 (Fla. 4th DCA 2000) ....................................................................... 12, 13

*Kentucky Center for Orthodontics, P.S.C. v. OrthAlliance, Inc., et al.,*
   Civil Action No. 02-517-KSF (Exhibit 7) ................................................................. 18-19

*LaRocca v. Howard-Reed Oil Co.,*
   277 S.W.2d 769 (Tex. App. 1955) ................................................................................ 17

*Lawyers Title Insurance Co. v. JDC (America) Corp.,*
   52 F.3d 1575 (11th Cir. 1995) ........................................................................................ 6

*Local No. 234 of United Association of Journeymen and Apprentices of Plumbing v.
   Henley & Beckwith, Inc.,*
   66 So. 2d 818 (Fla. 1953) ......................................................................................... 12, 13

*Montsdoca v. Highlands Bank & Trust Co.,*
   95 So. 666 (Fla. 1923) .................................................................................................. 12

*Orkin Exterminating Co., Inc. v. F.T.C.,*
   846 F.2d 1354 (11th Cir. 1988) ...................................................................................... 6

*Premier Associate Ltd. v. Loper,*
   778 N.E.2d 630 (Ohio Ct. App. 2002) .......................................................................... 17

*Rollins, Inc. v. Parker*
   755 So. 2d 839 (Fla. 5th DCA 2000) ............................................................................ 16

*Schaal v. Race,*
   135 So. 2d 252 (Fla. 2nd DCA 1961) ........................................................................... 12

*Singleton v. Foreman,*
   435 F2d. 962 (5th Cir. 1970) .................................................................................... 13-14

*Slusher v. Greenfield,*
   488 So.2d 579 (Fla. 4th DCA 1986) ............................................................................. 13

*Snow et. al v. OrthAlliance, Inc.*
   Case No. BC26093, Superior Court of the State of California (Exhibit 6) ............. 17-18

*Tusa v. Roffe*,
　791 So. 2d 512 (Fla. 4th DCA 2001) ...................................................................................19

*Wolf v. James G. Barrie, P.A.*,
　858 So. 2d 1083 (Fla. 2nd DCA 2003) ................................................................................16

## STATUTES

Federal Rule of Civil Procedure 56 ...........................................................................................6

Fla. Stat. Ann. § 466.0285 ..............................................................................................7, 15, 19

Fla. Stat. Ann. § 542.335 ................................................................................................... 14-16

64 FL ADC 64B5-17.013 ...........................................................................................................7

Plaintiffs Gregory P. Scott ("Dr. Scott") and Gregory P. Scott, D.D.S., P.A. ("Scott PA")[1] hereby file their Motion for Summary Judgment, and Brief in Support, as follows:

## I.
## INTRODUCTION.

Plaintiffs seek in this case to prevent OrthAlliance, Inc. ("OrthAlliance") from continuing to violate Florida law by illegally splitting Plaintiffs' professional fees in violation of 64 FL ADC 64B5-17.013 and illegally restraining trade through two unconscionable covenants not to compete in violation of Florida Statutes, § 542.335. OrthAlliance engages in such illegal activity through a complex series of contracts which the parties executed on or about October 22, 1996. As set forth in detail below, these agreements are illegal, and therefore, they are void and unenforceable as a matter of law. Accordingly, Plaintiffs are entitled to summary judgment on Counts I and III of their Amended Complaint.[2] Additionally, because no cause of action, at law or in equity, can be based on the enforcement of an illegal agreement, OrthAlliance's counterclaims against Plaintiffs must also fail as a matter of law.

## II.
## SUMMARY JUDGMENT EVIDENCE

In support of this Motion for Summary Judgment, Plaintiffs hereby file the following summary judgment evidence, which is attached hereto and incorporated herein by reference:

- Declaration of Dr. Gregory P. Scott and the documents attached thereto as Exhibits 1 and 1A – 1C;

- Declaration of Dr. Randall Schmidt and the documents attached thereto as Exhibit 2 and 2A-2B;

---

[1] Dr. Scott and Scott PA are hereinafter collectively referred to "Plaintiffs."
[2] After the completion of discovery, Plaintiffs may also independently move for summary judgment on Count II of their Amended Complaint regarding the corporate practice of dentistry. In the event such a motion is necessary, Plaintiffs will properly move for leave of court to file such a motion.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT--Page 1
38735:00001 : DALLAS : 1327212.1

- A true and correct copy of excerpts from the prior trial testimony transcript of Steve Toon as Exhibit 3;

- A true and correct copy of excerpts from the prior trial testimony transcript of Sam Westover as Exhibit 4; and

- True and correct copies of various orders from related cases pending around the country as Exhibits 5-6.

## III.
## STATEMENT OF UNDISPUTED FACTS

1. Dr. Scott is licensed to practice dentistry in the State of Florida and specializes in the practice of orthodontics. *See* Exhibit 1 at ¶ 2. Scott PA is the professional association through which Dr. Scott provides orthodontic care to his patients. *See id.* Scott PA is located in Lakeland, Florida. *See id.*

2. OrthAlliance is a corporate entity known as a "Practice Management Company" that purports to specialize in providing business and management related services to orthodontic professionals. *See* Exhibit 1 at ¶ 3.

3. On or about October 22, 1997, Plaintiffs executed a series of agreements with OrthAlliance, including: (1) a "Purchase and Sale Agreement" executed by OrthAlliance and Scott PA (Exhibit 1 at ¶ 5 and Exhibit 1A); (2) a "Service Agreement" executed by OrthAlliance and Scott PA (Exhibit 1 at ¶ 6 and Exhibit 1B); and (3) and an "Employment Agreement" executed by Dr. Scott and Scott PA (Exhibit 1 at ¶ 8 and Exhibit 1C).[3]

### Purchase and Sale Agreement

4. The first contract executed was the Purchase and Sale Agreement, under which Drs. Scott sold to OrthAlliance his interest in substantially all of the leasehold and tangible assets

---

[3] The Purchase and Sale Agreement, the Service Agreement, and the Employment Agreement are hereinafter collectively referred to as the "Agreements." Furthermore, the Agreements were actually executed with a company known as U.S. Orthodontic Care, Inc, ("USOC"), which is a predecessor in interest to OrthAlliance. *See* Exhibit 1 at ¶ 4. OrthAlliance has assumed all of USOC's responsibilities under the Agreements, and therefore, except where required by context, USOC will be referred to herein as OrthAlliance. *See id.*

associated with the operation of Scott PA. *See* Exhibit 1A. The purchase price for these assets was not based on their fair market value, but rather was based on Scott PA's 1996 adjusted gross revenue. *See id.* at § 2.01. The purchase price varied based on the service fee that Scott PA was willing to accept under the separate Service Agreement. *See* Exhibit 1 at ¶ 7; Exhibit 2 at ¶¶ 4-5; Exhibit 4 at p. 146:16-147:7; Exhibit 4 at p. 77:15-78:1; 87:14-87:22. For example, if Scott PA agreed to a higher service fee under the Service Agreement, then OrthAlliance would pay more for the assets it was acquiring under the Purchase and Sale Agreement. *See id.* As a condition to executing the Purchase and Sale Agreement, Dr. Scott was required to execute the Employment Agreement with Scott PA. *See id.* at § 6.11. The effect of the Purchase and Sale Agreement was to transfer ownership over substantially all of Scott PA's assets to OrthAlliance, but purportedly not the ownership of Scott PA itself. *See* Exhibit 1 at ¶ 5. The assets sold to OrthAlliance were then leased back to Scott PA under the terms of the Service Agreement. *See id.*

### Service Agreement

5.  The Service Agreement was executed by Scott PA and OrthAlliance. *See* Exhibit 1B. The Service Agreement obligates OrthAlliance to act as Scott PA's "sole and exclusive business manager" and to provide "comprehensive practice management, financial, and marketing services, and such facilities, equipment, and support personnel" which Scott PA reasonably required. *See id.* at § 1.1. Section 1.2-1.12 of the Service Agreement delineates approximately twenty-five specific services which OrthAlliance was required to provide to Scott PA. *See id.* at §§ 1.2-1.12.

6.  In exchange for purportedly providing these services, OrthAlliance was obligated to collect as a "service fee" 17% of Scott PA's adjusted gross revenue, plus an additional 25% of any reduction in Scott PA's overhead. *See id.* at § 3.1. Significantly, the amount of the service

fee when originally established was dependent not upon the fair market value of the services provided, but rather upon the amount of consideration OrthAlliance paid to Scott PA under the separate Purchase and Sale Agreement. *See* Exhibit 1 at ¶ 7; Exhibit 2 at ¶¶ 4-5; Exhibit 4 at p. 146:16-147:7; Exhibit 4 at p. 77:15-78:1; 87:14-87:22.

7.  As OrthAlliance's own executive officers have testified under oath, the service fees charged were not in exchange for the services provided, but rather were a return on its investment under the Purchase and Sale Agreement. *See* Exhibit 3 at p. 146:16-147:7; Exhibit 4 at p. 77:15-78:1; 87:14-87:22. In fact, OrthAlliance's own CEO has repeatedly reaffirmed that the service fee charged by OrthAlliance is not commensurate with the fair market value of the services provided, and that the payment of the service fee only makes sense when it is considered in connection with the upfront consideration the doctors received under the separate Purchase and Sale Agreements. *See* Exhibit 2 at ¶ 5; Exhibit 2B at p. 2.

## The Employment Agreement

8.  The last of the agreements executed by the parties was the Employment Agreement, which was executed by Scott PA and Dr. Scott. *See* Exhibit 1 at ¶ 8 and Exhibit 1C. OrthAlliance claims to be an express third-party beneficiary of the Employment Agreement even though it is not identified as such in the contract. *See* OrthAlliance's Amended Counterclaims at p. 23-24. Under the Employment Agreement, Dr. Scott agreed to operate as an employee of Scott PA for a five-year period, subject to being renewed for successive one-year terms. *See* Exhibit 1C at § 2.

9.  While Dr. Scott was subject to the terms of the Employment Agreement, he purportedly was not permitted to practice orthodontics at any other facility or for the benefit of any other patients. *See* Exhibit1 C at § 1. In addition, Dr. Scott was required to devote his "full

business time, attention, skill, and effort exclusively" to his orthodontic obligations with Scott PA. *See id.*

### The Covenants Not to Compete

10. The Agreements contain two covenants not to compete. The first covenant not to compete is contained at Section 2.9 the Service Agreement. This covenant states as follows:

> During the term of this Agreement, [Scott PA], and any of its shareholders, agrees not to establish, develop or open any office for the provision of orthodontic services within a ten (10) mile radius of any of the Centers covered by this Agreement (the "Area of Dominant Influence") without the express written consent of [OrthAlliance]. For a period of two (2) years following the termination of this Agreement, [Devito P.A.] and any of its shareholders shall be prohibited within the Area of Dominant Influence (i) from advertising in print (except for yellow page advertising and announcements for the opening of a practice) or electronic media of any kind, (ii) from soliciting in any manner patients, orthodontists or staff associated with the Centers, and (iii) from soliciting any referrals from any dentist who referred one or more patients to the Center within the three (3) years prior to the date of such termination. ...

*See* Exhibit 1B at § 2.9.

11. Independent of this covenant not to compete, the Service Agreement also contains a separate non-disclosure covenant which prohibits Plaintiffs from disclosing any purported confidential or trade secret information made available to them by OrthAlliance, and which further requires Plaintiffs to return such information to OrthAlliance upon termination of the Agreements. *See id.* at § 2.7.

12. The other covenant not to compete is contained in the Employment Agreements. Specifically, Section 5(b) of the Employment Agreements states that:

> For a period of two years following the termination of your employment, you may not (i) engage in any newspaper, print, radio, television or electronic advertising for your orthodontic or dental services in the broadcast coverage area of television stations in the market area where the Center covered by this agreement is located; (ii) actively solicit or directly market your orthodontic or

dental services (or those of any other orthodontic entity with which you are affiliated or employed) to anyone who was your patient (or a patient of the orthodontic entity) during the term of this agreement, (iii) provide orthodontic or dental services to any patients within a ten (10) mile radius of any Center(s)'s, (iv) actively solicit the Center's staff or patients, or (v) solicit referrals from any dentist who referred one or more patients from any dentist or the orthodontic entity within the two years prior to such termination.

Exhibit 1C at § 5(b).

### Plaintiffs' Orthodontic Practice

13. Dr. Scott has received little if any training from OrthAlliance, and has not been provided with any secret or special techniques regarding the practice of orthodontics. *See* Exhibit 1 at ¶ 9. The materials OrthAlliance provided to Dr. Scott and Scott PA have already been returned to OrthAlliance or have been given to counsel solely in connection with this litigation. *See id.* Dr. Scott and Scott PA are not in possession of any trade secret or confidential information belonging to OrthAlliance. *See id.*

## IV.
## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there are no genuine issues at to any material fact and that the moving party is entitled to judgment as a matter of law. The legal effect of a contract is a question of law that may properly be determined on summary judgment. *See Lawyers Title Ins. Co. v. JDC (America) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995). Here, the Court is presented with the question of the legality of the Agreements. The language of the Agreements is not in dispute, and therefore, their legality is a proper subject for summary judgment. *See Orkin Exterminating Co., Inc. v. F.T.C.*, 846 F.2d 1354, 1360 (11th Cir. 1988).

## V.
## ARGUMENT AND AUTHORITIES

As set forth in detail below, the Agreements are illegal in their entirety because they constitute illegal fee splitting. Thus, the Agreements are void and unenforceable as a matter of law, and therefore, all of OrthAlliance's counterclaims against Plaintiffs must fail. In addition, the covenants not to compete contained in the Agreements are independently unenforceable because they constitute illegal restraints on trade.

### A.      The Agreements Constitute Illegal Fee Splitting.

#### 1.     Florida law prohibits the payment of service fees that are not based upon the fair market value of the services provided.

Fee splitting is illegal in the State of Florida. Specifically, Rule 64B5-17.013(3)(f) of the Florida Administrative Code expressly states that a contract between a licensed dentist and a practice management company, such as OrthAlliance, cannot "directly or indirectly condition the payment or amount of the management fee on the referral of patients, *and in addition, the management fee shall reasonably relate to the fair market value of the services provided.*" *Id.* (emphasis added).[4] The inclusion of the phrase "in addition" makes it clear that this Rule prohibits two types of dental fee splitting: (1) service fees conditioned on the referral of patients; and "in addition" (2) service fees which are not reasonably related to the fair market value of the services provided under a management services contract.

---

[4] It is well settled that the violation of an administrative rule can give rise to the defense of illegality. *See, e.g., Advanced Risk Management, Inc. v. Prout*, 647 So.2d 911, 912 (Fla. 4th DCA 1994). Specifically, Rule 64B5-17.013, which was adopted by the Board of Dentistry, was specifically enacted to enforce the provisions of Section 466.0285, *Fla. Stat.*, which contains an express provision invalidating service agreements in violation of the statute. *See* 64 FL ADC 64B5-17.013. Significantly, the Board of Dentistry was delegated such rule making powers by the Florida Legislature pursuant to Section 466.004, *Fla. Stat.*, for the purpose of carrying out the provisions of the Florida Dental Practices Act. The Board of Dentistry's interpretation of a statute, and promulgation of rules pursuant thereto, are not only a valid expression Florida's public policy, but they are given great deference by the courts. *See Erfman v. Department of Professional Regulation*, 577 So.2d 710, 711 (Fla. 5th DCA 1991).

### 2. OrthAlliance has admitted that its service fee under the Agreements is not based upon the fair market value of the services provided.

Regardless of the manufactured claims it may raise in response to this Motion, OrthAlliance has repeatedly admitted that the service fees it collects under its Service Agreement are not based upon the fair market value of the services provided, but rather upon the amount of consideration it paid to affiliated orthodontists, such as Dr. Scott, under the Purchase and Sale Agreement. Specifically, under OrthAlliance's contracts, an affiliated orthodontist can receive more up front consideration under the Purchase and Sale Agreement (regardless of the assets actually purchased) if he or she agrees to pay a higher monthly service fee under the Service Agreement (regardless of the fair market value of the services actually provided).

These facts are not based upon hypothetical conjecture or a strained legal reading of the Agreements, but rather upon the repeated admissions of OrthAlliance. For example, during the trial of a related lawsuit styled *Mark A. Yaffey et. al v. OrthAlliance, Inc.*, Case No. 01-3175-CIV, in the United States District Court for the Southern District of Florida, Miami Division, OrthAlliance's executives admitted that the service fee charged under the Service Agreement was inextricably tied to the consideration OrthAlliance paid under the separate Purchase and Sale Agreement. Specifically, Steve Toon, OrthAlliance's Executive Vice President and Chief Development Officer, testified:

> Q. If the contract specified services to be provided and Dr. Yaffey is to pay fourteen percent for those, and you have told this jury that the recruitment activities that you and Mr. Teeples and Mr. Eckhardt undertook were not part of the service contract, then they have nothing to do with the fourteen percent. Is that correct?
>
> A. *The fourteen percent was not only for services, but for the up front dollars and for stock that Dr. Yaffey received.*
>
> Q. *The fourteen percent was, in part, a return on the investment that OrthAlliance made with that upfront payment?*

> A. *Yes.*
>
> Q. It was a way for OrthAlliance to assure itself, knowing what Dr. Yaffey's revenue had been for the past, of an amount of money that they would receive into the future. Is that correct?
>
> A. Hopefully, yes.

Exhibit 3 at p. 146:16-147:7 (emphasis added).

Mr. Toon's testimony was corroborated by Sam Westover, the former CEO of OrthAlliance, who likewise testified during the *Yaffey* trial that the purpose of the Purchase and Sale Agreement was to "invest" in the orthodontists' professional fees, with a return guaranteed by a service fee that was inextricably tied with this upfront consideration:

> Q. Now, the service agreement by itself standing alone obligates OrthAlliance to provide services to Dr. Yaffey in return for the fourteen percent fee. Is that correct?
>
> A. Yes.
>
> Q. This service agreement does not make any reference to any money that Dr. Yaffey got up front. Correct?
>
> A. It does not, but *we would not have signed the service agreement* if he had not signed the other agreement, neither would he. He would not have signed the service agreement If we had not paid him a million dollars up front. I am sure of that.
>
> . . .
>
> Q. Would OrthAlliance have entered into the purchase agreement unless the new entity entered into the twenty year service or consulting agreement with it?
>
> A. No. *There would be no return on our investment.* We would pay $1,000,000, and then there would be no revenue coming back to us.
>
> Q. So the contracts are linked?
>
> A. They had to be. We would not have spent $1,000,000 without an opportunity to have income coming back.

Exhibit 4 at p. 77:15-78:1; 87:14-87:22 (emphasis added).

Applying the testimony of OrthAlliance's executives to the facts of this case, it is clear that OrthAlliance's service fee is a means of investing in the future income stream of professional orthodontic practices. Specially, OrthAlliance purchased the assets of Scott PA with shares of OrthAlliance stock valued at 120% of Scott PA's 1996 adjusted gross revenue; although OrthAlliance could have purchased the exact same assets for 100% of Scott PA's 1996 adjusted gross revenue if Scott PA had agreed to a 14% service fee instead of a 17% service fee. *See* Exhibit 1 at ¶ 7; Exhibit 2 at ¶ 4. Because Scott PA elected to pay a 17% service fee, OrthAlliance agreed to pay the higher amount for the assets it purchased under the Purchase and Sale Agreement. *See* Exhibit 1A at § 2.1 Accordingly, Dr. Scott sold the assets of Scott PC to OrthAlliance for cash and shares of OrthAlliance stock valued at $971,124. *See* Exhibit 3A at p. 40. This amount of consideration is significant given that OrthAlliance valued the assets and liabilities purchased under the Purchase and Sale Agreement at only $41,289, or a mere 4.3% of the amount it actually paid to acquire such assets. *See id.*

OrthAlliance's service fee is based on the elevated consideration it paid under the Purchase and Service Agreement; not upon the fair market value of the services it actually provides to Scott PA. OrthAlliance has also admitted this fact. For example, during an OrthAlliance practice enhancement seminar in Orlando, Florida on or about April 6, 2000, Sam Westover, OrthAlliance's then acting Chief Executive Officer, stated.

> So, we are expanding the service[s] offer[ed] and, as we get larger, we've got more resources in order to be able to do that. So, but is it enough? And this is, this is the real quandary. Is, *is there any way in the world that we could ever provide you services that made you feel like you were getting $170,000 worth of value during that year? And I'm not sure that's possible.* I think, I think, the best way to do this is to have me keep reminding everyone, we got consideration. We're earning more than before; let's not lose track of that. And you're getting these other services, in addition. We can't just look at one piece of that. You really need to look at all three. And if you consider all three, it turns out to be a terrific deal for you and it's a terrific deal for us as well. *But if you just want to*