*take any one of those pieces, you can't justify [the service fee] in isolation. I think you need to look at all three.*

...

Theoretically, if we really could produce services that you felt like were worth $170,000 a year – where at the end of the year, you could say "I got these 20 things and, boy, what a good deal. It was probably worth more than $170,000. I'm, I'm really happy with that." *If that was the case we wouldn't have to pay any consideration at all. Right?* We could just offer those services to people and, and they would pay us the 17% of revenue.

Exhibit 2 at ¶ 5.

Additionally, during a meeting for OrthAlliance's Clinical Advisory Committee in San Diego, California on November 2, 2000, Mr. Westover made his most blatant admission that OrthAlliance's service fee was not commensurate with the value of the services actually provided. The "Minutes" from this meeting reflect as follows:

Sam Westover asked the members present, "What is it that we should be providing to our members?" The obvious answer from members in attendance was that *OrthAlliance services should be equal to the service fee. Mr. Westover stated that that is financially impossible.* We can provide things that you cannot get anywhere else. We want to add value *but it must be within reason.*

Exhibit 2B at p. 2.

These admissions readily establish that OrthAlliance's service fees are not reasonably related to the fair market value of the services provided. Rather, OrthAlliance's "service fees" are a means in which it shares in the professional fees generated by affiliated orthodontists, such as Dr. Scott. The extent of OrthAlliance's fee splitting is highlighted by the fact that virtually all of the costs associated with providing "services" to Scott PA are charged back the practice as a "Center Expense." *See* Exhibit 1B at §§ 3.2-3.3. For example, the costs associated with having an OrthAlliance consultant come out and visit Scott PA is charged back to the practice as a Center Expense, which Scott PA is required to pay in addition to the 17% service fee. *See id.*

Thus, Scott PA bears the expense of the services purportedly provided by OrthAlliance, while OrthAlliance gets to pocket the 17% service fee almost entirely as pure split in profits.

Based on the foregoing, it is clear that the Agreements at issue in this case violate Rule 64B5-17.013(3)(f), and therefore, constitutes illegal fee splitting. Accordingly, Plaintiffs respectfully request that Court declare the Agreements to be illegal, void, and unenforceable.

**B. Because the Agreements are Illegal, OrthAlliance's Counterclaims against Plaintiffs Must Fail as a Matter of Law.**

Under Florida law, it is well established that where a contract is illegal, "no action may be brought on it, whether in law or in equity." *Katz v. Woltin*, 765 So.2d 279, 280 (Fla. 4th DCA 2000).[5] In Florida, courts generally leave the parties to an illegal contract where it finds them. *See Local No. 234 v. Henley & Beckwith, Inc.*, 66 So.2d 818, 821 (Fla. 1953) ("when a contract or agreement, express or implied, is tainted with the vice of ... illegality, no alleged right founded upon the contract or agreement can be enforced in a court of justice....").[6] Because the Agreements in this case are illegal, the only remedy available to either party is to be left by the Court where it finds them. Accordingly, OrthAlliance's counterclaims against Plaintiffs must

---

[5] *See also Inter-Continental Promotions, Inc. v. Miami Beach First Nat. Bank*, 441 F.2d 1356, 1361 (5th Cir. 1971) ("the cases are legion that a contract against public policy may not be made the basis of any action in law or in equity."); *Local No. 234 of United Ass'n of Journeymen and Apprentices of Plumbing v. Henley & Beckwith, Inc.*, 66 So. 2d 818, 823 (Fla. 1953) ("[a]greements in violation of public policy are void because they have no legal sanction and establish no legitimate bond between the parties."); *Montsdoca v. Highlands Bank & Trust Co.*, 95 So. 666, 668 (Fla. 1923) ("The doctrine[] of estoppel [does] not in general apply in transactions that are forbidden by statute or that are contrary to public policy."); *Hoffman v. Boyd*, 698 So.2d 346, 349 (Fla. 4th DCA 1997) ("The fact that [a party] may have acted dishonorably does not prevent him from asserting the illegality of the very contract he freely and voluntarily entered."); *Castro v. Sangles*, 637 So.2d 989, 990 (Fla. 3rd DCA 1994) ("It is, of course, the general rule that no action may be maintained on an "illegal" contract."); *Gonzalez v. Trujillo*, 179 So.2d 896, 897-98 (Fla. 3rd DCA. 1965) ("The principle that courts will not enforce illegal contracts is well established."); *Schaal v. Race*, 135 So.2d 252, 257 (Fla. 2nd DCA 1961) ("An illegal contract is, as a rule, void -- not merely voidable -- and can be the basis of no judicial proceeding.").

[6] *See also Harris v. Gonzalez*, 789 So.2d 405, 409 (Fla. 4th Dist. Ct. App. 2001) ("A contract which violates a provision of the constitution or a statute is void and illegal, and, will not be enforced in our courts. Where the parties to such an agreement are *in pari delicto* the law will leave them where it finds them; relief will be refused in the courts because of public interest"); *Castro v. Sangles*, 637 So.2d 989, 991 (Fla. 3rd Dist. Ct. App. 1994) ("The courts will not in general aid either party to enforce an illegal agreement, but will leave the parties where they place themselves with reference to such illegal agreement, except where the law or public policy requires action by the courts, or where the parties are not *in pari delicto*....").

fail as a matter of law. *See Katz v. Woltin*, 765 So.2d 279, 280 (Fla. 4th DCA 2000); *Gregg v. U.S. Industries, Inc.*, 715 F.2d 1522, 1531 (11th Cir. 1983).

OrthAlliance will likely argue, however, that rather than being invalidated the Agreements should be reformed by the Court through the adoption of a more reasonable service fee. However, Florida courts have repeatedly stated the general rule that "it is *never* the role of a trial court to rewrite a contract ..." *Dows v. Nike, Inc.*, 846 So.2d 595, 601 (Fla. 4th DCA 2003) (emphasis added). Although Florida courts do not rewrite contracts, it may enforce an illegal agreement through the doctrine of severance:

> As to when an illegal portion of a bilateral contract may or may not be eliminated leaving the remainder of the contract in force and effect the authorities hold generally that a contract should be treated as entire when, by a consideration of its terms, nature, and purpose, each and all of its parts appear to be interdependent and common to one another and to the consideration. Stated differently, a contract is indivisible where the entire fulfillment of the contract is contemplated by the parties as the basis of the arrangement. On the other hand, a bilateral contract is severable where the illegal portion of the contract does not go to its essence, and where, with the illegal portion eliminated, there still remains of the contract valid legal promises on one side which are wholly supported by valid legal promised on the other.

*Local No. 234 v. Henley & Beckwith, Inc.*, 66 So.2d 818, 821-22 (Fla. 1953).

In this case, however, the doctrine of severance is inapplicable because the contracts are indivisible. Stated differently, were the court to apply the doctrine of severance in this case, it would completely eliminate the consideration term from the Service Agreement. Generally, contracts have been held to be indivisible where the provision that is invalidated as illegal is a substantial part of the benefit to be gained by one of the parties. *See Slusher v. Greenfield*, 488 So.2d 579, 581-82 (Fla. 4th DCA 1986) (senior shareholder provisions held indivisible from employment agreement where to sever meant that senior shareholder would have had same duties but lost substantial benefits he contracted to receive); *Singleton v. Foreman*, 435 F.2d 962,

969-70 (5th Cir.1970) (employment agreement was not divisible where eliminating illegal retainer fee provision would have eliminated the greater portion of the consideration contrary to parties' original mutual understanding). Because the service fee provision of the Service Agreement is clearly a "substantial part of the benefit" to be received in this case, the doctrine of severance is inapplicable. Thus, the Court must invalidate the Agreements in their entirety and leave the parties where it finds them.

C.  **The Covenants Not to Compete Contained in the Agreements are Unenforceable as a Matter of Law.**

The Agreements at issue in this case contain two unusual covenants not to compete. The covenants are found at Section 2.9 of the Service Agreement and Section 5(b) of the Employment Agreements. These covenants purport to restrict Plaintiffs from: (1) practicing orthodontics or dentistry within ten (10) miles of any existing office (the "Zone of Dominant Influence"); (2) advertising in print or "electronic media" within the "broadcast coverage area" of the market where any existing offices are located; (3) soliciting patients, staff, and orthodontists of Scott PA; and (4) soliciting referrals from any dentist which has referred a patient to Scott PA within the previous three (3) years. These covenants are independent from those covenants in the Agreements prohibiting Plaintiffs from disclosing OrthAlliance's alleged trade secret or confidential information. Rather, these covenants relate solely to Plaintiffs' ability to practice clinical orthodontics, an activity which OrthAlliance does not, and by law cannot, have any legitimate interest in restricting. Thus, as set forth in detail below, these covenants not to compete are void and unenforceable.

1.  **Covenants not to compete are subject to limited enforcement in Florida.**

Covenants not to compete entered into after July 1, 1996, are governed by Section 542.335, Florida Statutes. *See* Section 542.335(3), *Fla. Stat.* (2002). Because the covenants not

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT -- Page 14
38735:00001 : DALLAS : 1327212.1

to compete at issue in this case were entered into in October 1996, they are governed by Section 542.335. Under this statute, covenants not to compete are valid and enforceable only if they are: (1) reasonable in "time, area, and line of business;" (2) set forth in writing and signed by the person against whom enforcement is sought; (3) supported by one or more legitimate business interests; and (4) narrowly drafted so as to reasonably protect such legitimate business interests. *See* Section 542.335(1)(a)-(c), *Fla. Stat.* (2002). Covenants which fail to satisfy these elements are unlawful, and therefore, void and unenforceable. *See id.*

2.   **The covenants not to compete in the Agreements are unenforceable.**

As set forth in detail below, the covenants at issue in this case are void and/or unenforceable because: (1) OrthAlliance and Plaintiffs are not in the same "line of business;" and (2) OrthAlliance lacks standing to enforce the covenant not to compete contained in the Employment Agreements.

a.   **OrthAlliance does not compete with Plaintiffs.**

The covenants at issue herein are void and unenforceable because OrthAlliance does not compete with Plaintiffs, and therefore, the covenants are *per se* unreasonable as to the "line of business" sought to restrained. The undisputed summary judgment evidence establishes that Dr. Scott and Scott PA are in the business of providing orthodontic care to patients, but not in the business of providing practice management services to orthodontists. *See* Exhibit 1 at ¶¶ 2-3. In contrast, the undisputed summary judgment evidence establishes that OrthAlliance is in the business of providing practice management services to orthodontists, but not in the business of providing clinical orthodontic care to patients. *See id.* In fact, OrthAlliance is statutorily prohibited from practicing dentistry in the State of Florida. *See* FLA. STAT. ANN. § 466.0285 (2003). Accordingly, as a matter of law, there can be no competition between the parties. Yet,

OrthAlliance purports to have the right, under the covenants not to compete, to prohibit Plaintiffs from practicing orthodontics, marketing their services, and soliciting their patients.[7] Because OrthAlliance and Plaintiffs are not in the same line of business, however, the covenants are unenforceable.

Section 542.335(1) expressly provides that a covenant not to compete must be reasonable as to the "line of business" sought to be restrained. Interpreting a nearly identical provision in the statute governing covenants not to compete which were entered into prior to 1996, the Florida Second District Court of Appeals recently noted, "If the employer is not in a like business, it has no legitimate interest in protecting against competition in that business." *Wolf v. James G. Barrie, P.A.*, 858 So.2d 1083, 1085 (Fla. 2nd DCA 2003). The court further noted that the existence of competition between the coventor and the coventee is "a condition precedent to the validity of [a] noncompete agreement...." *Id.* at 1086 (citing *Hapney v. Central Garage, Inc.*, 579 So.2d 127, 131 (Fla. 2nd DCA 1991)).

Moreover, in determining whether a covenant not to compete is reasonable as to the "line of business," it is important to note that at least one Florida court has suggested that this phrase must be interpreted narrowly. In *Rollins, Inc. v. Parker*, a Florida Court of Appeals was asked to determine whether Sears and Orkin, who are both in the pest management industry but who use different methods of extermination, were competitors. 755 So.2d 839, 842 (Fla. 5th DCA 2000). The court held that they were not: "Sears and Orkin were not direct competitors in that, although they both operated to exterminate pests, their methods of doing business were completely

---

[7] The unenforceability of the covenants not to compete is highlighted by the fact that they only purport to prohibit Plaintiffs from competing with OrthAlliance in the provision of orthodontic services. It speaks volumes about the impropriety of these covenants that they do not prevent Plaintiffs from opening a practice management company and entering into direct competition with OrthAlliance. The covenants therefore have no bearing on OrthAlliance's legitimate interests in preventing competition in the business of practice management. They merely seek to unreasonably, and without cause, burden the practice of orthodontics.

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT -- Page 16**
38735:00001 : DALLAS : 1327212.1

different." *Id.* Accordingly, the court concluded that the covenant not to compete at issue was unenforceable. *See id.* at 842. Although the First District Court of Appeals was applying Georgia law, it did suggest that it would have reached the same conclusion even if it had been applying Florida law. *See id.* at 841 n.2 ("the common law rule in Georgia is not unlike the provisions of section 542.335, Florida Statutes (1997), which recognizes the validity of such restrictive covenants which protect an employer's 'legitimate business interests' and which 'are reasonable in time, area and line of business.'")[8]

In this case, OrthAlliance cannot establish the existence of competition between itself and Plaintiffs, and therefore, cannot establish that the covenants are reasonable as to the "line of business" sought to be restrained. This court would not be the first to reach such a conclusion. In a nearly identical lawsuit styled *Snow et. al v. OrthAlliance, Inc.*, a Superior Court of the State of California declared that OrthAlliance did not have a legitimate business interest in restraining orthodontists from providing orthodontic care. *See* Case No. BC26093, Opinion and Order on Plaintiffs' Motion for Summary Adjudication (First and Third Causes of Action), December 2,

---

[8] Several other jurisdictions have also held that actual competition is a prerequisite to the enforcement of a covenant not to compete. For instance, Georgia courts have declared that covenants not to compete are invalid in the absence of actual competition. *See Herndon v. Waller*, 525 S.E.2d 159, 161 (Ga. Ct. App. 1999) (holding that a covenant not to compete between a practicing veterinarian and a retired, inactive veterinarian was not reasonable because of the lack of actual competition between the parties). Wisconsin and New York courts have also held that actual competition is a prerequisite to an enforceable covenant not to compete. *See Geocaris v. Surgical Consultants, Ltd.*, 302 N.W.2d 76, 78 (Wis. Ct. App. 1981) ("Surgical Consultants has proven only that it needed to restrain Geocaris from performing surgery. It has offered no proof that Geocaris' practice as a physician, *exclusive of surgery*, would compete with its surgical practice.... The restraint was, therefore, not reasonably necessary") (emphasis added); *Karpinski v. Ingrasci*, 268 N.E.2d 751, 754 (N.Y. 1971) ("[I]t is not reasonable for a man to be excluded from a profession for which he has been trained when he does not compete with his former employer by practicing it"). Numerous other courts have similarly concluded that a covenant not to compete is unenforceable where an entity is no longer engaged in the business sought to be restrained. *See Premier Assoc. Ltd. v. Loper*, 778 N.E.2d 630, 636 (Ohio Ct. App. 2002) ("an employer which abandons its business may not enforce a covenant not to compete"); *Hess v. Gebhard & Co., Inc.*, 808 A.2d 912, 923 (Penn. 2002) (holding that employer no longer has a protectable business interest in preventing competition when it no longer engages in the business covered by the noncompete covenant); *Hayes v. Altman*, 266 A.2d 269, 272 (Penn. 1970) ("having sold his practice, [the employer] need not worry about competition"); *Gibson v. Eberle*, 762 P.2d 777, 779 (Colo. Ct. App. 1988) ("covenantee's right to enforce [a covenant not to compete] ends with the termination or abandonment of the business"); *LaRocca v. Howard-Reed Oil Co.*, 277 S.W.2d 769, 772-73 (Tex. App. 1955) ("the proper test to be applied is whether the interest which the covenant was designed to protect is still outstanding in the covenantee").

2002 (Exhibit 5). In declaring that OrthAlliance and the affiliated practices were not in a "like business," and therefore, that the covenants not to compete were unenforceable, the *Snow* court stated:

> The core of what a dentist does is what he is licensed to do: provide health care and practice dentistry. OrthAlliance does not and cannot practice dentistry or employ dentists or orthodontists. While a dentist or orthodontist, as an adjunct to his or her practice, may need to perform scheduling, billing, purchasing, hiring, or other administrative or clerical duties (or hire others to perform such duties for him or her), these functions are merely secondary to his or her business, which is the practice of dentistry. By contrast, the core of what OrthAlliance does is to provide clerical and administrative services to assist dentists in these collateral aspects of their practice.
>
> If OrthAlliance could enforce the covenant not to compete with respect to the individual plaintiffs, a business that is not controlled by medical professionals would have control over the employment of medical professionals. But corporations that are "purely commercial enterprises" may not control the employment of licensed medical professionals. The clinical practice of dentistry, which the individual plaintiffs are licensed to perform, is not a "like business" as compared to the business of OrthAlliance.

*Id.* at pp. 9-10 (internal citations omitted).

Likewise, the United States District Court for the Eastern District of Kentucky has also invalidated OrthAlliance's covenants not to compete on the basis that there is no competition between OrthAlliance and its affiliated orthodontists. Specifically, in *Kentucky Center for Orthodontics, P.S.C. v. OrthAlliance, Inc., et al.*, Civil Action No. 02-517-KSF, Opinion and Order dated July 30, 2004 (Exhibit 6), the Eastern District of Kentucky analyzed the applicability of OrthAlliance's covenants not to compete and concluded:

> Since [Kentucky Centers for Orthodontics] and Drs. Durbin and Huang [the owners of Kentucky Centers for Orthodontics] provide licensed orthodontic services and [OrthAlliance] provides practice management services to orthodontic practices, [OrthAlliance] can not enforce the covenant not to compete in the Employment Agreement. The provision of licensed orthodontic services does not compete with [OrthAlliance's] provision of practice management services to orthodontic practices, therefore, the Court declines to enforce this clause.

*Id.* at p. 17.

The *Snow* and *Kentucky Centers* cases are highly persuasive because they deal with the same issues, the same alignment of parties, and the same covenants not to compete. Moreover, the central premise of *Snow* and *Kentucky Center's* holdings is that entities which are not engaged in a "like business" cannot enforce restrictive covenants against one another. This premise is entirely consistent with the requirement under Florida law that a restrictive covenant must be reasonable as to the "line of business" sought to be restrained.

Because there is no competition between Plaintiffs and OrthAlliance, OrthAlliance does not have, and could not have, a legitimate business interest in seeking to restrain Plaintiffs from providing orthodontic care. As a result, there is no genuine issue of material fact that the covenants not to compete are void and unenforceable as a matter of law.

    **b.**     <u>**OrthAlliance lacks standing to enforce the covenant not to compete contained in the Employment Agreement.**</u>

Under Florida law, third-party beneficiaries can enforce covenants not to compete only so long as (1) the restrictive covenant expressly identifies the person as a third-party beneficiary of the contract and expressly states that the restrictive covenant is intended for the benefit of such person; and (2) in the case of an assignee or successor, the restrictive covenant expressly authorizes enforcement by a party's assignee or successor. *See* Fla. Stat. Ann. § 542.335(1)(f). In the case at bar, OrthAlliance is not expressly identified as a third-party beneficiary of the covenants not to compete in the Employment Agreement, and therefore, cannot enforce the terms therein. *See Tusa v. Roffe*, 791 So. 2d 512, 514 (Fla. 4th DCA 2001). Accordingly, summary judgment as to the enforceability of these covenants is appropriate.

## VI.
## CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment; declare that the Agreements are illegal and unenforceable as a matter of law; dismiss with prejudice OrthAlliance's counterclaims against Plaintiffs; declare OrthAlliance's covenants not to compete to be void and unenforceable as a matter of law; award Plaintiffs their costs and attorneys' fees; and grant such other and further relief at law or in equity to which Plaintiffs may be entitled.

Respectfully submitted,

/s/ Christopher M. LaVigne
Richard Goldstein
  Fla. Bar No. 197319
  Email: richard@gttpa.com
GOLDSTEIN, TANEN & TRENCH, P.A.
One Biscayne Tower, Suite 3250
Two South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 374-3250
Facsimile: (305) 374-7632

Brian A. Colao – *pro hac vice*
  Texas Bar No. 00793528
  Email: bcolao@lockeliddell.com
Christopher M. LaVigne – *pro hac vice*
  Texas State Bar No. 24026984
  Email: clavigne@lockeliddell.com
LOCKE LIDDELL & SAPP LLP
2200 Ross Avenue, Suite 2200
Dallas, TX 75201
Telephone: (214) 740-8000
Facsimile: (214) 740-8800

COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to the following:

>Scott Clearman
>McClanahan & Clearman, LLP
>4100 Bank of America Center
>700 Louisiana
>Houston, Texas 77002

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants:

>Samuel R. Mandelbaum
>Mandelbaum & Fitzsimmons, P.A.
>One Tampa City Center, 27th Floor
>PO Box 3373
>Tampa, Florida 33601-3373.

>/s/ Christopher M. LaVigne

C

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION



| | | |
|---|---|---|
| RONALD C. PERKINS, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3-03-CV-1732-N |
| | § | |
| ORTHALLIANCE, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Orthalliance's Motion to Stay or, In the Alternative, Motion to Dismiss, filed August 25, 2003. Orthalliance argues that the action commenced by Plaintiffs Jim Bill Morrow and Morrow Orthodontics, P.C. ("Morrow") should be stayed in favor of binding arbitration required by the Purchase and Sale Agreement entered into by Orthalliance and Morrow. In addition, Orthalliance requests stay or dismissal of the claims by Defendants Ronald C. Perkins and Ronald C. Perkins, D.D.S., M.S.D. ("Perkins") under the doctrine of abstention. Because a valid arbitration agreement covers the dispute at issue, the Court must stay the proceeding against Morrow. Although abstention does not apply, the Court will stay the action against Perkins pending appeal of the Court's Memorandum Opinion and Order in the related proceeding of *Penny v. Orthalliance*. The Court will, by separate Order, address Defendants' Motion for Partial Summary Judgment.

### I. BACKGROUND

In July of 1999, Plaintiffs Jim Bill Morrow and Ronald C. Perkins and their respective orthodontic practices entered into a series of agreements with OrthAlliance in which

ORDER – PAGE 1



OrthAlliance acquired the physical assets of the individual Plaintiffs' orthodontic practices and agreed to provide practice management services. In return, the individual Plaintiffs received a substantial amount of money and agreed to remain working at their practices for at least five years and not to compete with OrthAlliance following the termination of the parties' agreements. The parties concurrently executed a series of three agreements to delineate their relationship: (1) a Purchase and Sale Agreement, by which Perkins and Morrow sold business assets to OrthAlliance; (2) a Service Agreement, which provided for OrthAlliance control over practice management and financial services; and (3) an Employment Agreement, whereby Morrow and Perkins contracted to provide services to OrthAlliance. Contained in the Purchase and Sale Agreement entered into between Morrow and OrthAlliance is an arbitration clause which states:

> Any controversy, dispute or disagreement arising out of or relating to this Agreement, the breach thereof, or the subject matter thereof, shall be settled exclusively by binding arbitration, which shall be conducted in Los Angeles, California in accordance with the Commercial Arbitration Rules administered by the American Arbitration Association before a single arbitrator selected by the parties jointly. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

The Perkins agreements do not include any arbitration provision.

This Court has previously declared that a virtually identical set of three agreements entered into by OrthAlliance and an orthodontic practice should be construed together as a single contract, and are illegal as a violation of the Texas Dental Practices Act. *Penny v. Orthalliance, Inc.*, 255 F. Supp. 2d 579, 583 (N.D. Tex. 2003).[1] Following the Court's ruling in *Penny*, Morrow and Perkins declared their agreements with OrthAlliance to be in default

---

[1] *Penny* is currently pending in the Fifth Circuit Court of Appeals.
ORDER – PAGE 2

and forwarded a notice of default to OrthAlliance. On or about July 11, 2003, OrthAlliance filed an action against Perkins in Texas state court seeking a declaration that the agreements were valid and enforceable. In response, Plaintiffs filed the instant matter, seeking a declaratory judgment that the agreements between the parties are invalid and illegal in their entirety, and, alternatively, seeking various remedies for OrthAlliance's breach of such agreements. OrthAlliance now requests a stay pending binding arbitration with Morrow, and claims that abstention of the claims by Perkins is appropriate.

## II. ANALYSIS

### *A. Arbitration Clause*

OrthAlliance argues that the Court should stay the instant action by Morrow pursuant to the arbitration clause contained in the 1999 Purchase and Sale Agreement. The first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. *Harvey v. Joyce*, 199 F.3d 790, 793 (5th Cir. 2000) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*, 460 U.S. 1, 24 (1983)). In deciding whether parties have agreed to arbitrate a particular claim, a court must determine "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Personal Sec. & Safety Sys., Inc. v. Motorola, Inc.*, 297 F.3d 388, 392 (5th Cir. 2002) (quoting *OPE Int'l LP v. Chet Morrison Contractors, Inc.*, 258 F.3d 443, 445 (5th Cir. 2001)). Doubts concerning the scope of coverage of an arbitration clause ordinarily are resolved in favor of arbitration. *Personal Sec. & Safety Sys.*, 297 F.3d at 392; *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24 (recognizing the "liberal federal policy favoring arbitration agreements."). Therefore, "arbitration should not

ORDER – PAGE 3

be denied 'unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue.'" *Pennzoil Exploration and Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998) (quoting *Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990)).

Plaintiffs urge the Court to deny OrthAlliance's motion, arguing that this dispute does not fall within the scope of the arbitration agreement contained in just one of the three contracts, and suggesting that the Court should not refer to an arbitrator a dispute under a contract virtually indistinguishable from one that it has already deemed void. Initially, the Fifth Circuit has consistently held that "separate agreements executed contemporaneously by the same parties, for the same purposes, and as part of the same transaction, are to be construed together." *Neal*, 918 F.2d at 37. "[W]here the parties include a broad arbitration provision in an agreement that is 'essential' to the overall transaction, we will presume that they intended the clause to reach all aspects of the transaction – including those aspects governed by other contemporaneously executed agreements that are part of the same transaction." *Personal Sec. & Safety Sys.*, 297 F.3d at 394-95. In fact, this Court's *Penny* opinion, reviewing a set of agreements entered into by OrthAlliance that are virtually indistinguishable from the agreements now at issue, construed all three agreements as a single contract. *Penny*, 255 F. Supp. 2d at 583 (citing *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000)).

There is no serious contention that the Sale and Purchase Agreement, which contains the arbitration clause, was not an integral part of the overall transaction. Although Plaintiffs suggest that the Sale and Purchase Agreement is not the "keystone" agreement signed by the

ORDER – PAGE 4

parties, Fifth Circuit precedent simply requires that the arbitration clause be "contained in an agreement that is 'essential' to the overall transaction." *Personal Sec. & Safety Sys., Inc.*, 297 F.3d at 394. Here, Plaintiffs themselves characterize the Purchase and Sale Agreement, the Service Agreement, and the Employment Agreement as the "core documents" to the underlying transactions – the "series of agreements pursuant to which OrthAlliance acquired the physical assets of their orthodontic practices and agreed to provide certain management services." Plaintiff's First Amended Complaint at ¶¶ 12-13. In fact, Plaintiffs confirm that these three agreements contain a "web of interlocking provisions" which work together to form the basis of their underlying claims. *Id.* at ¶ 36. The Purchase and Sale Agreement itself refers specifically to the Service Agreement and Employment Agreement, suggesting the interdependency between the three contemporaneously-executed contracts.

In addition, the arbitration provision is drafted broadly, confirming that it was intended to cover disputes arising under the interrelated Service and Employment Agreements. The provision applies not only to disputes "arising out of" the Purchase and Sale Agreement, but also those "relating to" the "Agreement, the breach thereof, or the subject matter thereof." Morrow's interpretation – that arbitration only applies to disputes arising out of the Purchase and Sale Agreement – would render the additional contract language superfluous, effectively ignoring the inclusion of the words "relating to" and "the subject matter thereof." Such interpretation is contrary to the traditional principles of contract law. *See Int'l Turbine Services, Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 497 (5th Cir. 2002) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)) (In Texas, "courts must examine and consider the entire writing and give effect to all provisions such that none

ORDER – PAGE 5

are rendered meaningless."). Indeed, in *Personal Security & Safety Systems, Inc.*, the Fifth Circuit considered a plaintiff's argument that a broadly-worded arbitration provision contained within a Product Development Agreement did not apply to claims arising under a separate agreement. *Personal Sec. & Safety Sys.*, 297 F.3d at 393. The Court held that the broad wording of the arbitration provision required arbitration of claims of breach of the related agreement. In so holding, the Court explained:

> Where, as here, an arbitration provision purports to cover all disputes "related to" or "connected with" the agreement, we have held that the provision is "not limited to claims that literally 'arise under the contract,' but rather embrace[s] all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute."

*Id.* (quoting *Pennzoil Exploration and Prod. Co.*, 139 F.3d at 1067). Accordingly, the arbitration provision contained within the Purchase and Sale Agreement covers the claims raised by Plaintiffs.

Plaintiffs further contend that the Court should refuse to stay this action in favor of arbitration, since the agreements at issue are virtually indistinguishable from the contracts deemed void in *Penny*. Indeed, Plaintiffs suggest that granting a stay would effectively require an arbitrator to enforce an agreement that is a nullity under Texas law, a result they deem "unwarranted and contrary to public policy." However, Fifth Circuit law is clear that the district court may only rule upon a specific challenge to the arbitration clause; a defense to the entire agreement must be ruled upon by the arbitrator. For example, in *Primerica Life Ins. Co. v. Brown*, the Fifth Circuit reversed the judgment of a district court judge who failed to compel arbitration because the contract sought to be enforced through arbitration was void

ORDER – PAGE 6

due to lack of capacity. *Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 472 (5th Cir. 2002).

The Court explained that,

> In *Prima Paint*, the [Supreme] Court held that, under § 4 of the FAA, the "making" of an agreement to arbitrate was not called into question by an allegation that the entire contract was void as fraudulently induced. "[The FAA] does not permit the federal court to consider claims of fraud in the inducement of the contract generally . . . A federal court may consider only issues relating to the making and performance of the agreement to arbitrate." Accordingly, unless a defense relates specifically to the arbitration agreement, it must be submitted to the arbitrator as part of the underlying dispute.

*Id.* (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967)); *see also Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 218 (5th Cir. 2003) ("where parties have formed an agreement which contains an arbitration clause, any attempt to dissolve that agreement by having the entire agreement declared voidable or void is for the arbitrator.").

Similarly, the Court in *Lawrence v. Comprehensive Bus. Servs. Co.* affirmed a district court's order of arbitration over plaintiffs' objection that requiring arbitration of the alleged breach of an illegal contract would violate Texas public policy. *Lawrence v. Comprehensive Bus. Servs. Co.*, 833 F.2d 1159, 1162 (5th Cir. 1987). There, the plaintiffs sought a judgment declaring a franchise agreement illegal under the Texas Public Accountancy Act, and argued that enforcing the arbitration provision of such agreement would contravene Texas law. *Id.* The Court held that "[b]ecause the Lawrences do not attack the arbitration agreement itself, *Prima Paint* requires that their claim of illegality be arbitrated pursuant to the contract." *Id.*

Accordingly, the validity of the agreements must be submitted to the arbitrator, and OrthAlliance's motion to stay must be granted.[2]

### B. Abstention

OrthAlliance argues that abstention of the Perkins claims is appropriate, since the state court case was filed first and the action requires analysis of a state statute. The Supreme Court has recognized that in certain cases, considerations of "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation" will favor abstention under the doctrine set forth by *Colorado River*. *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817 (1976) (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952)). However, the *Colorado River* Court, and scores of courts interpreting its holding, caution that:

> Abstention from the exercise of federal jurisdiction is the exception, not the rule. "The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest."

*Colorado River*, 424 U.S. at 813 (quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188-89 (1959)); *see also In re Abbott Laboratories*, 51 F.3d 524, 529 (5th Cir. 1995) ("*Colorado River* abstention is to be used only sparingly").

---

[2] Although this result might appear peculiar, "there is no reason to assume at the outset that arbitrators will not follow the law; although judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the statute." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 232 (1987); *see also Primerica Life Ins. Co.*, 304 F.3d at 473 (Dennis, J., concurring) ("if the facts are as they appear to be on the record before us, I can conceive of no way in which the contract underlying this action could be enforced [by the arbitrator] . . .").

ORDER – PAGE 8